CONSOLIDATED GAS CO. v. MAYER et al.

(Circuit Court, S. D. New York. June 8, 1906.)

1. CONSTITUTIONAL LAW—DENIAL OF EQUAL PROTECTION OF LAWS—STATUTE
   FIXING GAS RATES.

   The New York Gas Commission Act, Laws 1905, p. 2100, c. 737, § 21,.
   provides that, if it shall be established in any action to collect a charge for
   gas that a price has been demanded in excess of that fixed by the com-
   mission or by statute, no recovery shall be had therein, but the fact of
   such excessive charge shall be a complete defense. Laws 1906, c. 125,
   limits the price which may be charged for gas in the borough of Manhattan
   to 80 cents per 1,000 feet, and provides that any corporation or person
   violating the act shall forfeit the sum of $1,000 for each offense. *Held*
   that, in view of the right of a gas company affected thereby to invoke the
   decision of the courts as to the constitutionality of the rates fixed by the
   statute or commission, the other provisions which would in the mean-
   time subject it to ruinous penalties were a practical denial of the equal
   protection of the laws, and that in a suit in a federal court to test the
   constitutionality of the rates complainant was entitled to a temporary in-
   junction restraining the officers charged with that duty from enforcing
   or attempting to enforce such provisions until the final determination of
   the suit; all charges collected, however, in excess of those fixed by the
   statute or commission, to be impounded, to abide the event of the suit.

   [Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Constitutional Law,
   § 691.]

2. INJUNCTION—PRELIMINARY ORDER—SCOPE.

   The rate fixed by the state, however, being in the exercise of its un-
   questioned powers, and presumed to be just and proper unless the contrary
   is shown on final hearing, the terms of such an injunction should not be
   enlarged so as to undertake to restrain the actions of individual consumers,
   who are not parties to the suit.

In Equity.   On motion to continue temporary injunction.

James F. Beck, Charles F. Mathewson, John A. Garver, and John
F. Leillon, for the motion.

Charles E. Hughes, and William P. Burr, opposed.

LACOMBE, Circuit Judge.   The parties to this suit are all citizens
of the state of New York, but the main contention—practically, the
sole contention—of the complainant is that certain statutes of this state
and an order of the gas commission are obnoxious to various provisions
of the Constitution of the United States, and for that reason void.
This court, therefore, from which appeal lies direct, without review by
any intermediate tribunal, to the Supreme Court of the United States,
not only has jurisdiction, but is the appropriate forum, because through
a suit brought here a final decision by the ultimate interpreter of that
Constitution can be most quickly obtained.

This is a motion by the complainant for a continuance of the tempo-
rary injunction, which was issued as the condition of an adjournment
asked for by defendants, and also for an enlargement of the terms of
such injunction.   It is in no sense a hearing upon the merits of all the
issues presented.   The fundamental propositions in dispute involve
many controverted questions of fact, and it is the practice of this court
not to resolve such questions upon affidavits, but to reserve them for
final hearing, where every sworn statement comes to the court, not.

ex parte, but after the test of a cross-examination. The matters to be passed upon here and now can be most tersely and quickly presented by an analysis of the injunction order already made.

1. In entering that order the court did not find, nor did it express nor even intimate an opinion, that the action of the gas commission in fixing the price to be charged for gas at 80 cents per 1,000 cubic feet was confiscatory, nor that the act of the Legislature establishing the same price (chapter 125 of 1906) was in that respect unconstitutional and void. It did not undertake to abrogate or nullify that provision of the statute. As between the consumer and the manufacturer, it left the question as to what the former should pay to the latter precisely where it stood before. Any consumer who might be asked to pay the old rate was left by the order entirely free to decline to pay it, and to make a tender at the new rate for the gas he had consumed. Naturally so, because, except for the city of New York, whose situation is exceptional, the individual consumer was not a party to the suit, and had not been served with process. In the case of a consumer, who upon demand chose to pay the old rate, the order provided that the company should not cover the 20 cents difference into its treasury, but should leave it impounded under direction of the court, so as fully to insure its return to the person paying the same in the event of the company's failing to succeed in its litigation. In the case of a consumer who chose to make tender at the new rate, and to stand upon whatever rights were secured to him by the action of the gas commission in fixing that rate, and by the action of the Legislature in establishing the same rate, the order left him entirely free and untrammeled to apply for such relief as the law afforded him in the event of the company's seeking to compel payment of the difference. It was not perceived when the order was made, nor is it perceived now, upon what theory this court could by an injunction restrain any individual who was not a defendant, and had never been served with process, from himself applying to an appropriate court if he should conceive himself to be aggrieved. What relief he might obtain when he so applied would be for that court to determine when it heard his application. The order did, however, provide that the gas company might charge or demand payment at the old rate, and might collect at that rate from such as chose to pay, and it enjoined the defendants (who are public officers, and, as such, the proper persons to institute and prosecute actions, to enforce and recover certain statutory penalties) from in any way enforcing, or attempting to enforce, two acts of the Legislature and an order of the gas commission, or any of the provisions thereof, against the complainant, until it should have its day in court, upon such a case as it might be able to make, to question the constitutionality of that order and of those acts. The reason why it was thought that a court of equity, irrespective of any question of the merits of the controversy as to the propriety of the new rate, should upon mere inspection of the statutes themselves grant such temporary relief will be apparent upon the statement of a few elementary propositions of law, and an analysis of certain provisions of those statutes.

A corporation which undertakes, for its own emolument, to supply gas to the inhabitants of a municipality, under charters and franchises

from the state which allow it to embark in such industry, and invite its stockholders to invest their money therein, is engaged in what is called a "public service" or a "public utility," and therefore is under the supervision, inquisition, and regulation of the state as to the manner in which it conducts its business. If, untrammeled by competition, it charges a price far above all reasonable cost to the helpless consumer, who must pay that price or go without, while it receives an exorbitant return on such of its property as is invested in the enterprise, the state may step in and reduce that price to such sum as will, taking everything into consideration, be a reasoanble return upon what has been adventured in the enterprise on the faith of the state's franchises. No one disputes this proposition. But in fixing such price the state should itself be fair and reasonable—should certainly stop short of confiscation. If it were established by uncontroverted proof that, in materials, labor, and wear and tear of plant at the lowest conceivable valuation, the actual cost of producing gas of a proper standard in the holders was 50 cents per 1,000 cubic feet, it would be confiscation for the state to require the manufacturer to deliver such gas to all consumers at 5 cents per 1,000 cubic feet. Such an act of the Legislature would be obnoxious to the Constitution of the state, to the Constitution of the United States, and to common right and justice. There may be persons who dispute this proposition, but it may safely be assumed that it is accepted by every community which lives under law and not under anarchy. These are the two extremes, and somewhere between them there lies a dividing line. Who is to determine where that dividing line lies? Under our system of government that question has always been left to the decision of the courts. Reagan v. Farmers' L. & T. Co., 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014; Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819. Every individual who feels himself aggrieved either by the action of some other individual or of the state or the nation is secured the right to bring his grievance before some court. It may be a court of law or of equity, a court established by a statute or by a Constitution, a state court or a federal court, but somewhere or other there is provided for him a forum to which he can present his case, can support it by proof, and have his hearing. That is "due process of law," a heritage from long centuries of struggle, which this nation and its constituent states have deposited in the corner stones of their written Constitutions. Every one is entitled, sometime, somewhere, to his "day in court." The most swollen aggregation of capital, crystallized into an individual by the act of the state or national government which has made it a corporation, is as much entitled to have free access to the courts as is the humblest toiler by night to whom every additional cent, disbursed for the light he works by, means a shrinkage of his food supplies.

There are two statutes dealing with the matter now in controversy. Neither of them, in express terms, undertakes to deny the complainant access to any court to test the merit of the contention it makes, viz., that the new rate is confiscatory, and that, therefore, the old rate should be paid. But there are two sections in those acts which challenge consideration. In the gas commission act (chapter 737, p. 2100, of the Laws of 1905) we find:

"Sec. 21. Defense in cases of excessive charges. If it be alleged and established in any action brought in any court for the collection of any charge for gas or electricity, that a price has been demanded in excess of that fixed by the commission or by statute in the municipality wherein the action arose, no recovery shall be had therein, but the fact that such excessive charges have been made shall be a complete defense to such action."

In the act which provides that companies furnishing gas in the borough of Manhattan "shall not charge or receive for gas manufactured, furnished or sold　*　*　*　a sum per 1,000 cubic feet in excess of　*　*　*　80 cents," we find the following:

"Sec. 3. Any corporation, association, copartnership or person violating any provision of this act shall forfeit the sum of $1,000 for such offense to the people of the state."

The drastic character of these provisions will be perceived when their results are considered. If the gas company, pending the final determination of a suit such as this to determine whether the Legislature has fixed a just and proper price, should charge its consumers the lower rate, and receive the same without protest or demand of payment at the higher rate, it could never recover the difference, even should it be decided by the court of last resort that it was entitled to demand such higher rate. Having delivered its product for the particular month, and received the amount it asked for such product, that transaction would be finally closed. Both parties having agreed upon the price, without any reservation, it would be the contract price for that month's delivery, which the seller could not thereafter dispute. If it should take two or three years to get a final decision on the merits, the 20 cents difference of rate, all claim to which during the interim the company had thus abandoned, would concededly amount to several millions of dollars. Should the company ultimately prevail in the test suit, this would be an enormous fine to pay for the privilege of having its day in court. It could escape that fine only by demanding, on presentation of each monthly bill, payment at the higher rate, preserving its claim to the difference, whenever the lower rate was paid and received, by a protest, which would reiterate the demand. The statute (chapter 737, p. 2092, Laws 1905) undertakes effectually to close up that avenue of escape.

Ordinarily, when there is a dispute between seller and buyer as to the rate to be paid for anything, the question is settled by the seller bringing suit for the price of what he has sold calculated at the higher rate. The statute, however, practically undertakes to debar the company from bringing any such suits against its customers. The twenty-first section (quoted, supra) provides that if in any action brought to collect any charge for gas it shall appear that a price has been demanded in excess of the rate fixed by the gas commission or by statute, that fact shall be a complete defense to the action—to the whole action—not only to so much of it as seeks to collect the excess, but also to so much of it as seeks to collect the amount concededly due. Now, whenever the seller of anything verifies a complaint to be used in an action at law, which asserts that he is entitled to receive and asks to recover a sum of money, he may fairly be said to be preparing to make a de-

mand therefor; and the moment he serves such complaint upon the buyer he has indisputably made such demand. But the statute says that the mere making of such a demand shall constitute a complete defense.; in other words, if the statute is valid, the cause of action which the plaintiff may think it has is slaughtered at the very moment it sets foot within the halls of justice.. The merits of the controversy as to what rate should be charged will never be litigated in that action, because no defendant would be so foolish as to discuss any such issue, when the mere fact that action is brought relieves him from all payment whatsoever.

The only course left for the gas company is to bring some direct suit, such as this, to test the constitutionality of the action of the gas commission and of the Legislature in fixing an 80-cent rate, and meanwhile to preserve its rights to the difference by demanding payment thereof, as each monthly bill is presented to each consumer. To close up this avenue of approach to the courts, however, the other act (chapter 125 of 1906) provides that, whenever a manufacturer and seller of gas in the borough of Manhattan shall charge or receive anything in excess of 80 cents per 1,000 cubic feet, it shall for each offense forfeit $1,000 to the people of the state; and section 1962 of the Code of Civil Procedure makes it the duty of the defendants, the Attorney General, and the District Attorney to institute suits for recovery of such penalties. Every time the company demands payment for gas furnished at the higher rate, every time it receives such payment from any consumer who may be willing to pay temporarily, and abide the result of the test suit, it incurs such a penalty. For very many years it has been the custom in this borough to present monthly bills for gas sold, and it appears from the record that the complainant has upwards of 390,000 customers. The calculation is a simple one. Long before this test suit could be heard next fall, the aggregate of the penalties incurred would utterly wipe out the entire property of the complainant, whether it were worth the amount found by the gas commission, or were worth the highest estimate at which the most astute and experienced financiers might capitalize it.

Commenting upon a statute which prescribed similar cumulative penalties for every charge of more than a certain sum per head for yarding cattle, where a few days' violation of the statute by merely charging a higher rate would exhaust the entire value of the property in satisfaction of the penalties incurred, Mr. Justice Brewer, writing the opinion in Cotting v. Kansas City Stock Yards Co., 183 U. S. 79, 22 Sup. Ct. 30, 46 L. Ed. 92, says:

"Do the laws secure to an individual an equal protection when he is allowed to come into court and make his claim or defense subject to the condition that upon a failure to make good that claim or defense the penalty for such failure either appropriates all his property, or subjects him to extravagant and unreasonable loss? Suppose a law were passed that, if any laboring man should bring or defend an action, and fail in his claim or defense, either in whole or in part, he should in the one instance forfeit to the defendant half of the amount of his claim, and in the other be punished by a fine equal to half the recovery against him, and that such law by its terms applied only to laboring men, would there be the slightest hesitation in holding that the laborer was denied the equal protection of the laws? The mere fact that the courts are

open to hear his claim or defense is not sufficient, if upon him alone there is visited a substantial penalty for a failure to make good his entire claim or defense. * * * Suppose a statute providing that every corporation failing to establish its entire claim or to make good its entire defense should as a penalty therefor forfeit its corporate franchise, and that no penalty of any kind except a matter of costs was attached to like failures of other litigants, could it be said that the corporations received the equal protection of the laws? * * * A statute, although, in terms, opening the doors of the courts to a particular litigant, which places upon him as a penalty for a failure to make good his claim or defense a burden so great as practically to intimidate him from asserting that which he believes to be his rights, is, when no such penalty is inflicted upon others, tantamount to a denial of the equal protection of the laws."

In the case cited the judges who concurred in reversing the judgment appealed from did so upon another ground, but the language of Mr. Justice Brewer, dictum though it be, commends itself as a clear and forceful exposition of the law.

It is difficult to see in what respect the provisions of the two acts now under consideration differ from those passed upon in the Kansas City Stock Yards Case, except that they are perhaps more drastic. On this branch of the case there is no controversy as to the facts, and under the opinion last quoted, these provisions seem obnoxious to the fourteenth amendment to the Constitution of the United States. In order, therefore, to secure to the complainant its right to prosecute this suit to its orderly conclusion, without meanwhile being trammeled—or, as it may be more appropriately expressed, overwhelmed—by multitudinous actions for cumulative penalties, the temporary injunction which restrains the public officers, who are made defendants, and any one else whom the injunction may reach and hold, from enforcing, or attempting to enforce, the provisions of the acts and order of the gas commission against the complainant, will be continued until final hearing and decision of the cause in this court. The judge who hears the cause upon the merits of the whole case may find some good reason for modifying the injunction, or even for vacating it, but, on the record as it stands now, to this measure of relief the complainant seems clearly entitled.

2. The application to extend the terms of the injunction, so as to enable complainant to collect the 20 cent difference by summary measures (such as refusal to supply gas) from such consumers as may not be willing to pay it, to have it impounded, and to abide the result of this suit, presents different questions, and brings us into a field of controversy upon the facts. However obnoxious the statutory provisions already discussed may be to the prohibitions of the Constitution, it would seem that their elimination would still leave a statute consistent and complete. Provisions hampering the right to question a rate fixed by legislative action are not essential to a scheme which undertakes to fix such rate. "It is familiar law that one section or part of an act may be invalid without affecting the validity of the remaining portion of the statute. Any independent provision may be thus dropped out if that which is left is fully operative as a law, unless it is evident from a consideration of all the sections that the Legislature would not have exacted that which is within, independently of that which is beyond, its powers." Reagan v. Farmers' L. & T. Co., 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014.

The complainant contends that it should be protected against the irreparable injury it would suffer by reason of its inability after two or three years to collect, in the event of ultimate success, the unpaid differences from a floating aggregate of consumers, some of whom will disappear, and others of whom are pecuniarily irresponsible, so that a judgment against them would not be worth the cost of entering it. It is thought that complainant's apprehensions in this respect are exaggerated. On the contrary, it seems quite likely that the great bulk of its customers will prefer to pay the small amounts of excess rate demanded each month, when assured that the sums thus paid will remain secure and intact, to be repaid upon the termination of the test case should complainant not succeed therein, rather than to begin a multiplicity of suits to prevent the company from making its collections in the usual manner. The first two or three months will show how this will be. Meanwhile, each individual is left free to make his election, and a loss—possibly a heavy one—may result, which in the event of final success the company could not recover. This is an argument which has always appealed most strongly to courts of equity, and there are abundant authorities to support the proposition that, pending the decision of a doubtful question, the status quo, proper security being exacted, should be preserved. But the courts in all such cases also take into consideration what is the character and measure of the doubtfulness. Here the state, which concededly has the right to fix a proper rate, has prescribed a rate whose propriety is challenged. Prima facie, it is to be presumed that the state's rate is a proper one, and the burden is upon the complainant to show that it is not. If we are correct in the assumption that the penalty clauses already discussed are not an essential part of the statute, without which it would be abortive, then the question of the propriety of the rate can only be decided upon a careful and exhaustive examination of many facts and deductions therefrom, some of which will certainly be controverted. In the Kansas Stockyards Case, which is mainly relied upon, the fundamental vice of the statute was that it undertook to provide that the owner of a single stockyard should charge only a named sum for each head of cattle, while the owners of all other stockyards in the state (and there were several of them) might charge what they pleased. That vice could be as clearly demonstrated by undisputed affidavits to a court upon application for preliminary injunction as it could be at final hearing. A similar vice is alleged to inhere in the later act (of 1906), fixing the 80-cent rate, which subjects New York City gas corporations to a different rule from that applicable under the gas commission act of 1905 to all the other gas corporations in this state. But if the gas commission act be held to be itself unconstitutional (as complainant with great apparent force contends here), this argument will not be so persuasive.

3. If the only subject of inquiry were the rate fixed by the gas commission, a different situation would be presented. Under the authorities, in fixing the rate to be charged for "public service" by private corporations, two elements of calculation are of fundamental importance: What is the true present value of the property embarked in the enterprise? and what, in view of the risks of the business, is a fair annual per-

centage of return thereon? That percentage would not necessarily be the same in every variety of business. The manufacture, storage, and delivery of a highly explosive material is a more risky business than is the transforming of flour into bread, or of leather into shoes, and the delivery of such products. The commission reached the conclusion that 8 per cent. was a proper return on property invested in the gas business. In estimating the value of the property of complainant embarked in the business, the commission reached the conclusion that the franchises under which it has laid mains and is delivering gas, and which are a part of its property, should be considered as of no value whatever, although the state, through the action of its taxing officers, has declared that they are worth several millions of dollars. It is suggested that some of these franchises have expired or lapsed in some way. That proposition need not be considered, because it is not asserted that all of them have lapsed. The complainant has taken over the franchises of many different corporations, granted at different times. So long as a substantial part of these still remain, the argument is not affected, except as to details of result. The reason assigned by the commission for not including the value of the franchises is that "they were granted by the people without compensation." That is so. These franchises were granted very many years ago, at a time when there seems to have been no intelligent appreciation of the fact that they might become enormously valuable, when reckless improvidence was the rule, and all sorts of franchises were given away, without any provision for securing to the state its fair share of unearned increment thereon. Nevertheless, when the state offers a franchise to whoever will take it without requiring any money return thereon, and for the sole consideration that the taker shall promtply, continuously, and fully develop it by the expenditure of his own money, and such offer is accepted, and the terms of the agreement carried out by the taker, there results a contract, which, with due consideration of all proper conditions and limitations inherent in the nature of the particular contract, is as much within the protection of the Constitution as are all other contracts. If the state 25 or 50 years therafter should say to the taker: "We were very improvident in not providing that you should pay us something each year for this franchise; therefore, hereafter you shall pay us 8 per cent. annually on $10,000,000 or $20,000,000, or we will evict you from the franchise," it might find itself embarrassed by the provisions of the Constitution in thus undertaking to avoid the results of its own improvidence. A franchise, whatever its value may be, which has not expired nor lapsed, nor been in some way forfeited, is property in the hands of its holder. There is force in the argument that when the state says: "We will value this property at several millions of dollars when we tax you on it, but at nothing at all when we fix the rate you may charge for your product in order to receive an 8 per cent. return on your property," it is seeking to accomplish by indirect methods what it might not be able to accomplish directly. Moreover, it is contended that the act of 1905, under which the gas commission acted, is obnoxious to the Constitution for grounds not already discussed, apparent on the face of that act itself.

4. But in the case at bar these arguments seem wholly academic. Irrespective of any action of the gas commission, the Legislature has itself fixed the 80-cent rate, and there is nothing to indicate upon what it predicated such action. For aught that we know, it may have reached the conclusion that the commission was in error in not including the franchises at their taxable value in the estimate of complainant's property, and may, at the same time, have concluded that 7, or 6, or even 5 per cent. was a proper return to be received by the owner of such property. This brings us to the fundamental question presented by the pleadings: Is the rate fixed by the Legislature (80 cents) so low as to be unjust or confiscatory? As was indicated at the outset of this opinion, there can be no intelligent answer given to this question until the whole case is presented upon testimony taken, not ex parte, but according to the rules for taking testimony in equity causes. Therefore, until the court at final hearing may have the opportunity to pass upon such a record, although the existing order is continued, its terms will not be enlarged, so as to undertake to restrain the actions of individual consumers, who are not parties to this suit, and have not been served with process.

5. A few minor details remain to be disposed of:

(a) The city of New York is the largest consumer, an undoubtedly solvent consumer, and the only one made a party defendant. The rate it is to pay is not regulated by the action of the gas commission, nor by either of the two acts already considered. Chapter 736, p. 2091, of the Laws of 1905, provides that it shall pay only 75 cents per 1,000 cubic feet, and to that act there is raised an additional constitutional question not heretofore discussed. The representatives of the city and of the complainant have had no difficulty during two or three years of controversy in arranging a modus vivendi, whereby all rights of either side are reserved, and gas is furnished as required. It is not to be anticipated that there will be any difficulty about continuing such arrangement, but to facilitate it the order now to be entered may provide that payment by the city at the 75-cent rate, and acceptance thereof by complainant under protest, shall not operate as an accord, satisfaction, waiver, or estoppel, to the prejudice of either side in any litigation, pending or future. Such a clause may make it practicable for these contestants to eliminate some questions as to accruing interest.

(b) This court fully appreciates the importance of a prompt disposition of this cause, which not only presents questions of grave importance, but which, also, including the other causes heard at the same time, affects the interests of nearly half a million of households. There is no apparent reason why a final hearing on the merits should not be reached with reasonable expedition. In the event of demurrer or exceptions to any pleading being filed by either side, this court will hear and dispose of the same at any time during vacation, upon a week's notice. As soon as the cause is at issue, upon request of either side and upon four days' notice, the court will apportion the three months which the rules allow for taking the testimony. Promptness on the part of complainant, which evidently has large interests at stake, may fairly be assumed, but it may be insured by the insertion in the order of a clause providing that, in the event of any unreasonable delay, ap-

plication may be made to suspend the injunction. Promptness on the part of the defendants is equally assured. They are public officers, who not only represent the state, but are also, in this test suit, the representatives of the great body of consumers, who will be insistent to secure a speedy determination of the questions at issue. It should be borne in mind that the controversies of fact presented are not new. The entire field has been fought over before the gas commission and elsewhere. Each side knows just what evidence it requires to support its contentions, and knows, too, where that evidence is to be found. The great bulk of the proof is already prepared, probably already in type. Charters, contracts, reports, exhaustive tabulations of receipts, disbursements, percentages, calculations, etc., are immediately accessible, and will, no doubt, with proper reservation of exceptions as to their materiality, be stipulated in by consent of counsel. When the cause is placed upon the calendar, its great public importance will insure its being given a preference, and it seems reasonable to expect that it can be finally submitted on the merits not later than November of this year.

(c) The Supreme Court in Chicago, M. & St. P. R. R. v. Tompkins, 176 U. S. 167, 20 Sup. Ct. 336, 44 L. Ed. 417, has indicated the practice to be followed in cases of this kind. The testimony should not be taken before an examiner, but before some competent master, who is to make all needed computations, and find fully the facts. Such a disposition will, at the proper time, be made of this cause.

(d) The order continuing the injunction should contain a clause providing that, in the event of complainant failing to succeed finally in the litigation, the preparation of the papers required for refund and the distribution of the amounts due to the respective consumers, including such interest as the condition of the fund after paying expenses of administration may warrant, shall be performed by the company; and, upon its being shown that refund has been made to any consumer by crediting the amount due him upon any current monthly bill or bills, or otherwise, such amount shall be returned to the company, week by week, or at such shorter intervals as the court may approve. It will also contain a further clause that all consumers who may change their address or may remove out of the borough should notify the clerk of the court or the gas company of such change of address, to the end that whatever refund they may be eventually found entitled to may be paid to them at their new address without their being put to the inconvenience of coming to the special master or to the company to collect it.