Ex parte WOOD.

(Circuit Court, W. D. North Carolina. July 22, 1907.)

1. HABEAS CORPUS—JURISDICTION OF FEDERAL COURTS—DISCHARGE OF STATE PRISONER.

Where a federal court granted a preliminary injunction restraining the officers of a state from enforcing a state statute fixing rates to be charged by railroads for the carriage of passengers within the state pending suits by the railroad companies to determine the constitutionality of such statute, and by its order required such companies to issue coupons to purchasers of tickets calling for the difference between the rates charged and the statutory rate, to be repaid in case the statute was sustained, the selling of tickets in conformity to such order was "an act done * * * in pursuance of * * * an order * * * of a court" of the United States, within the meaning of Rev. St. § 753 [U. S. Comp. St. 1901, p. 592], and, where an agent is adjudged guilty of a crime and imprisoned for such act by the state authorities, the federal court is authorized by such section to discharge him on a writ of habeas corpus.

[Ed. Note.—Jurisdiction of federal courts, see note to In re Huse, 25 C. C. A. 4.]

2. CONSTITUTIONAL LAW—DENIAL OF EQUAL PROTECTION OF LAWS—STATUTE IMPOSING EXCESSIVE PENALTIES.

Section 4 of the North Carolina act of 1907 (Pub. Laws 1907, p. 250, c. 216), prescribing the maximum rates which may be charged by railroad companies for the carriage of passengers within the state, which provides that any railroad company violating any provision of the act shall be liable to a penalty of $500 for each violation payable to the person aggrieved, and any agent of such company violating the act shall be guilty of a misdemeanor and subject to fine or imprisonment or both, is unconstitutional as a denial to the railroad companies of the equal protection of the laws by subjecting them to excessive and ruinous penalties if they exercise their right to contest the validity of the law in the courts.

[Ed. Note.—Imposition of penalty, extra allowance of damages, costs, or fees as denial of equal protection of law, see note to Williamson v. Liverpool & London & Globe Ins. Co., 72 C. C. A. 547.]

Petition for Writ of Habeas Corpus.

Jas. H. Wood, W. B. Rodman, and Moore & Rollins, for petitioner. Jas. H. Merrimon, for the State.

PRITCHARD, Circuit Judge. This is an application of the petitioner, Jas. H. Wood, to be discharged on a writ of habeas corpus from the custody of the sheriff of Buncombe county. The petitioner was indicted on a charge of having violated the provisions of section 4 of an act passed at the session of the Legislature of North Carolina of 1907 (Pub. Laws 1907, p. 250, c. 216) prescribing the maximum charges railroad companies may make for transporting passengers in North Carolina, tried and convicted, and sentenced to a term of 30 days' imprisonment to be worked upon the public roads of Buncombe county.

Some time since suits were instituted in the Circuit Court of the United States for the Eastern District of North Carolina by several railroad companies against the Corporation Commissioners of North Carolina, the Attorney General, and the Assistant Attorney General of that state, for the purpose of obtaining protection of the fourteenth amendment to the Constitution of the United States against an act of

the Legislature of North Carolina establishing maximum rates which such companies claimed to be confiscatory, and, on a prima facie case, a motion was made for interlocutory injunctions. Accordingly, on the 29th of June, injunctions pendente lite were issued enjoining the defendants and all other persons from putting the rates into effect during the inquiry as to the constitutionality of the same, and from instituting prosecutions or attempting to impose penalties upon the companies, or their employés, for a failure to put into effect the statutory rates which are being contested. The court amply preserved the rights of the traveling public by requiring a coupon to be given to each purchaser evidencing the amount to be refunded to him in the event the rates should be upheld, and to secure the same ample bond and security were given. This was in accordance with the law of North Carolina where a rate made by the Commission is attacked. Thereupon the matter was referred to a master to ascertain the facts and report his conclusions, and, to avoid delay, he was required to make his report by the 25th of September, and the hearing was fixed for the first Monday in October, so as to give the parties an opportunity to have the questions involved finally determined by the Supreme Court at the earliest possible moment. There was nothing unusual in the proceedings instituted by the several railroad companies in the state. Similar suits have been instituted in the state of Alabama, where Judge Jones issued an injunction, and also in the state of Georgia, where Judge Newman pursued the same course. Notwithstanding the United States Circuit Court had thus taken jurisdiction of the whole matter and was proceeding in an orderly way with its consideration, the evidence shows that the Governor of North Carolina has issued an address to the judges of the superior courts of the state, questioning the authority of the court to make the order referred to, and asking them to see that indictments against the agents and employés of the railroads and its officials be sent before the grand jury in order that the state may undertake the prosecutions which are enjoined in my order, and stating that, as chief executive of the state, he stands ready to aid them in enforcing the law. In accordance with this policy, a number of indictments have been found and prosecutions begun in defiance of the order of injunction issued by this Circuit Court. If these prosecutions are permitted and continued, the result will be to nullify the injunction which was granted by the court, and to practically defeat its jurisdiction. Not only are the rights of litigants involved, but the dignity and authority of the Circuit Court of the United States as well. These prosecutions and arrests, taking place in widely separated portions of the state, present serious difficulties in the matter, and this court is confronted with open and avowed opposition by the powers of the state. Obstacles are being thrown in the way of inquiry by this court on writs of habeas corpus into the legality of arrests, and this seems to be the deliberate policy of those representing the state. The court does not wish to be understood as imputing improper motives to the Governor or other state officials. The penalties prescribed by the state statute for charging more than the statutory rates are so enormous that, if permitted to be enforced, they would practically bankrupt the railroad in an exceedingly brief time,

and before a final hearing could be had in the cause, and thus place the complainant in a position where it would be powerless to assert a right which is guaranteed to it by the Constitution of the United States. If the criminal prosecutions against the agents, conductors, and employés are permitted to continue, the managers of the railroads cannot successfully operate their trains, carry the mails, or continue their usefulness as common carriers doing an interstate business.

The Constitution of North Carolina contains ample provision for the protection and preservation of the liberty of the citizen.

Article 1, § 18, contains the following:

"Every person restrained of his liberty is entitled to a remedy to inquire into the lawfulness thereof, and to remove the same, if unlawful; and such remedy ought not to be denied or delayed."

Section 21 of the same article also provides:

"The privileges of the writ of habeas corpus shall not be suspended."

Section 1821 of the Revisal of North Carolina of 1905 is as follows:

"Every person imprisoned or restrained of his liberty within this state, for any criminal or supposed criminal matter or on any pretense whatsoever, except in cases specified in the succeeding section, may prosecute a writ of habeas corpus according to the provisions of this chapter, to inquire into the cause of such imprisonment or restraint, and if illegal, to be delivered therefrom."

Section 1828 of the same chapter is the only law of which the court has any knowledge that imposes upon a judge a penalty for a failure to perform a judicial act. The section in question reads as follows:

"If any judge authorized by this chapter to grant writs of habeas corpus shall refuse to grant such writ when legally applied for, every such judge shall forfeit to the party aggrieved two thousand and five hundred dollars."

Thus it will be seen that the state Constitution of North Carolina, as well as the statutory law, affords ample protection to every person who is deprived of his liberty without due process of law, and, such being the case, it is remarkable that any one representing the state should be opposed to the granting of the writ of habeas corpus. Likewise, the Constitution of the United States and the Revised Statutes afford every citizen of the Union when imprisoned contrary to law protection to the fullest extent by the writ of habeas corpus.

Article 1, § 9, cl. 2, of the Constitution of the United States, is as follows:

"The privileges of the writ of habeas corpus shall not be suspended unless in cases of rebellion or invasion, the public safety may require it."

Section 751 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 592] contains the following provisions:

"The Supreme Court and the Circuit and District Courts shall have power to issue writs of habeas corpus."

"The several justices and judges of the said courts, within their respective jurisdictions, shall have power to grant writs of habeas corpus for the purpose of an inquiry into the cause of restraint of liberty." Rev. St. § 752.

"The court, or justice, or judge to whom such application is made shall forthwith award a writ of habeas corpus, unless it appears from the petition itself that the party is not entitled thereto. The writ shall be directed to the person in whose custody the party is detained." Rev. St. § 755.

Notwithstanding the plain provisions and enactments contained in the Constitution and Revised Statutes of the United States, as well as the state Constitution and the statutes of the state, it is seriously contended that the agents of the complainant in this instance, when indicted for the violation of the statute (the enforcement of which has been restrained by this court), are not entitled to a remedy which is afforded to every other citizen of the state. If this policy is to prevail in North Carolina, persons who invest their money in enterprises like that of the complainant will be deprived of the means of protecting their property rights and denied the benefits of the writ of habeas corpus which is intended for the preservation of the liberty of every citizen. It will be a sad day for the people of North Carolina when its citizens are prohibited by the acts of the Legislature from asserting any right guaranteed to them by the Constitution of the United States. Suits of this character have been brought in different states of the Union, and in every instance the federal courts have proceeded to determine the questions involved without interference, hindrance, or delay by the legislative or judicial authorities of such states. The equal protection of the law is guaranteed to every citizen of the United States, and I shall employ all means within the power of the court to secure to persons who invoke the jurisdiction of this court such rights to the fullest extent of the law. If the law is construed in a spirit of fairness and impartiality, there can be no conflict of jurisdiction between the state courts and the courts of the United States.

Much has been said in regard to the power of a court of equity to enjoin the prosecution of a criminal case. In the case of Dobbins v. Los Angeles, 195 U. S. 241, 25 Sup. Ct. 18, 49 L. Ed. 169, Mr. Justice Day, who delivered the opinion of the court, in discussing this phase of the question, said:

"It is well settled that, where property rights will be destroyed, unlawful interference by criminal proceedings, under a void law, or ordinance, may be reached and controlled by a decree of a court of equity. Davis & Farnum Mfg. Co. v. Los Angeles, 189 U. S. 207, 218, 23 Sup. Ct. 498, 47 L. Ed. 778, and cases there cited."

In this instance the federal court has not been the aggressor, but has simply adopted the regular practice and procedure which has been approved by the Supreme Court of the United States in cases of a like nature, and, while the court is not inclined to do anything that will produce an unseemly conflict, nevertheless it is incumbent upon it to protect the rights of the parties to this controversy as well as maintain the dignity and authority of this court, and this cannot be accomplished without preserving to the fullest extent the jurisdiction of the court in determining the question which has been submitted to it for consideration. If, in pursuing the usual and well-defined practice and procedure in such cases with the sole view of maintaining the jurisdiction of this court, at any stage of the proceeding, conflict must come, and I trust that it may not, I shall not evade the responsibility which is imposed upon me as the presiding officer of this court.

Much has been said about the sovereignty of the state. That question does not arise in this controversy. This court having assumed jurisdiction of the subject-matter involved in the original suit, wherein the

railroad companies are complainants and the railroad commissioners and others are defendants, the real question is as to whether this court shall be denied full and complete jurisdiction of the subject-matter at issue in that suit. If the contention of the counsel representing the state be true, then this court can be deprived of its jurisdiction by the multiplication of criminal prosecutions in the state courts against the complainant, its agents, and employés to such an extent as to finally place it in a position where it will be deprived of a larger amount than that which is involved in the original controversy, and thus, by indirection, the complainant will be denied a right which is guaranteed to it by the Constitution of the United States. This proposition is inconsistent with the well-established rules of judicial procedure, and does not commend itself to this or any court sitting as a court of equity. It excludes the idea of comity between the courts of concurrent jurisdiction.

Suppose complainant had instituted its suit in the state court, instead of applying to this court, and that court had granted an injunction in pursuance of the laws of the state, could it be seriously contended that the state court, after having taken jurisdiction of the questions involved in the civil action, thus instituted, would permit the complainant to be subjected to criminal prosecutions and suits for the recovery of the enormous penalties enumerated in the statute of the state during the pendency of the action, and before there could be an ascertainment as to the rights of the parties to the original suit? The state court, under such circumstances, would undoubtedly preserve the rights of the parties until the final hearing, and any other course would be without precedent in the judicial history of the state. Notwithstanding this, we are confronted with an attempt on the part of those representing the state to do that which, if successful, would render this court powerless to grant the same relief that would be granted as a matter of course in another court of concurrent jurisdiction. The law provides that in all cases where the federal courts have concurrent jurisdiction with the state courts that such courts shall have power and authority to adjudicate any question that may come before such tribunals and to protect the rights of litigants to the same extent as that of the state courts. The suits out of which this controversy arose were instituted in the same manner as other suits are instituted, and involving, as they do, the validity of a statute of North Carolina, it necessarily follows that all matters connected with the enforcement of such statute, during the pendency of that suit, are under the control and jurisdiction of the court wherein the questions involved are being litigated. The court in the original suit having assumed jurisdiction of the questions at issue in that controversy, and having entered a decree wherein, among other things, the complainant and its agents were directed to employ certain means and do certain things in respect to the sale of tickets during the pendency of that suit, the court thereby assumed control of, and dominion over, the management of the business of the complainant in so far as intrastate transportation is concerned in the same manner as if the court had appointed a receiver of the property of complainant.

As a general rule, the Circuit Courts of the United States will not

issue the writ of habeas corpus in cases where persons are indicted and imprisoned in pursuance of a statute of a state. However, it must be remembered that this is not an attempt on the part of the state to enforce a law which has for its object the preservation of the peace, protection of the morals, or the general welfare of the public, and it cannot be insisted that these prosecutions are necessary to promote the welfare of the public in view of the fact that this court has amply protected the rights of those who may purchase tickets by requiring the complainant to give bond amply sufficient to secure the payment of any damages that may be sustained; but, on the other hand, is a penal statute, enacted with the sole view of enforcing obedience to the first section of the act which undertakes to fix maximum passenger rates. Therefore, inasmuch as the validity of the act which prescribes passenger rates is being contested, and the court has by injunction restrained the enforcement of the same, there is every reason why this court should exercise its discretion in granting writ of habeas corpus, when it is apparent that prosecutions of the complainant and its agents are being instituted solely for the purpose of deterring the complainant from prosecuting its original suit. In view of this situation, the court is called upon to determine the question whether the petitioner is entitled to be discharged, inasmuch as it appears to the court that the act, on account of which he was indicted, was committed in pursuance of an order and decree of this court.

Section 753 of the Revised Statutes of the United States is as follows:

"The writ of habeas corpus shall in no case extend to a prisoner in jail, unless where he is in custody under or by color of the authority of the United States, or is committed for trial before some court thereof; or is in custody for an act done or omitted in pursuance of a law of the United States, or of an order, process or decree of a court or judge thereof; or is in custody in violation of the Constitution or of a law or treaty of the United States; or, being a subject or citizen of a foreign state, and domiciled therein, in its custody for an act done or omitted under any legal right, title, authority, privilege, protection, or exemption claimed under the commission, or order, or sanction of any foreign state, or under color thereof, the validity and effect whereof depend upon the law of nations; or, unless it is necessary to bring the prisoner into court to testify."

The provisions of the foregoing section are so plain that there can be no doubt as to the true intent and meaning of the same. It is provided in express terms that the writ of habeas corpus shall extend to one who is in custody for an act done or omitted in pursuance of a law of the United States, or of an order, process, or decree of a court or judge thereof.

In the case of State v. Boone, 132 N. C. 1108, 44 S. E. 595, Chief Justice Clark, who delivered the opinion of the court, in discussing the Neagle Case, among other things, said:

"No such doctrine is found in Neagle's Case [Neagle's Case, 135 U. S. 1, 10 Sup. Ct. 658, 34 L. Ed. 55] for it only holds that what the federal government enjoins as a duty the state cannot punish as a crime."

This court by proper order having directed that the complainant should provide a ticket with a coupon attached thereto representing the difference between the present rate and the proposed rate, it thereby

became the duty of the company and its agents to strictly comply with the requirements of such order, and any failure on their part to observe the same would render them liable to an attachment for contempt, and under such circumstances, the duty being enjoined by this court, the performance of the same by the complainant and its agents would not render them liable to punishment under the statute of the state. Any attempt to punish the company or its agents for the observance of the order and decree of this court would be in utter disregard of the comity which should exist between the state and federal courts, as well as an absolute nullity. If the state courts possess the power to indict persons acting under the directions of the federal court for the performance of a duty enjoined upon them in a suit which may be brought in such court, then the power of the Circuit Courts of the United States would be completely paralyzed, and such courts would be rendered unable to proceed to the determination of any question involving the validity of the statute of a state Legislature.

While the court is of the opinion that the petitioner is entitled to be discharged for the reasons hereinbefore stated, nevertheless there is another phase of this question which should be considered, in order that there may be a proper determination of the matter in controversy and in the consideration of which it is incumbent upon the court to pass upon the validity of section 4 of the act in question, which reads as follows:

"That any railroad company violating any provision of this act shall be liable to a penalty of five hundred dollars for each violation, payable to the person aggrieved by such violation, and recoverable in an action to be instituted in the name of said person in any court of this state having competent jurisdiction thereof. And any agent, servant, or employee of any railroad company violating this act shall be guilty of a misdemeanor, and upon conviction shall be fined or imprisoned, or both, in the discretion of the court."

The foregoing section, among other things, provides that the company or its agents shall pay a penalty of $500 for each failure to comply with the requirements of the act. It has been held that no state can constitutionally close the doors of the courts to a judicial inquiry into the constitutionality of the rates it fixes. In the case of Railroad Company v. Minn., 134 U. S. 456, 10 Sup. Ct. 702, 33 L. Ed. 970, it was held by the Supreme Court of Minnesota that the act in fixing rates was conclusive, and there could be no inquiry into such rates by judicial tribunals. Accepting this construction of the Minnesota act by the Supreme Court of that state, the Supreme Court of the United States declared the act unconstitutional, because it denied the railroad company a judicial investigation into the validity of the rates. If this cannot be accomplished directly, it cannot be done indirectly. It is well settled that what cannot be done by express enactment cannot be done by device or indirection. Therefore any system of penalties which is intended to have the effect, and which is so framed as to have the effect of closing the doors of the courts to a judicial inquiry as to rates, is in consequence of that fact unconstitutional and void. Section 4 of the act in question clearly attempts to do this. It imposes upon the company as a penalty for an unsuccessful attempt to appeal to the court, no matter how bona fide this bill is made, such enor-

mous fines and penalties in favor of individuals as to burden the challenger of the act in the courts so as to make it, if the penalties were valid, practically impossible for such an appeal to be made.

In the case of Cotting v. Kansas Stockyards Co., 183 U. S. 100, 22 Sup. Ct. 39, 46 L. Ed. 92, Mr. Justice Brewer, who delivered the opinion of the court, in discussing this phase of the question, said:

"It may be said that this is a penal statute, and therefore it is to be construed in favor of the delinquent, and that we have a right to expect that the state courts will construe the penalty as not attaching to the charge for each head of stock, but only to that upon the separate bunches shipped by different individuals. But is the language so clear that there is no doubt as to the construction? Is there not enough in it to justify a construction which may be accepted by the trial courts and approved by the Supreme Court of the state, and the construction of a state statute by the Supreme Court of the state is in a case like this conclusive upon us? Must the party upon whom such a liability is threatened take the chances of the construction of a doubtful statute? If the one construction is placed upon it, then obviously, even accepting the largest estimate of value placed by any witness upon the property of the company, a single day's violation of the statute would exhaust such entire value in satisfaction of the penalties incurred. In this feature of the case we are brought face to face with a question which legislation of other states is presenting. Do the laws secure to an individual an equal protection when he is allowed to come into court and make his claim or defense subject to the condition that, upon failure to make good that claim or defense, the penalty for such failure either appropriates all of his property, or subjects him to extravagant and unreasonable loss? Let us make some illustrations to suggest the scope of this thought.

"Suppose a law were passed that if any laboring man should bring or defend an action and fail in his claim or defense, either in whole or in part, he should in the one instance forfeit to the defendant half of the amount of his claim, and in the other be punished by a fine equal to half of the recovery against him, and that such law by its terms applied only to laboring men, would there be the slightest hesitation in holding that the laborer was denied the equal protection of the laws? The mere fact that the courts are open to hear his claim or defense is not sufficient, if upon him, and upon him alone, there is visited a substantial penalty for a failure to make good his entire claim or defense. Take another illustration: Suppose a statute that every corporation failing to establish its entire claim, or make good its entire defense, should as a penalty therefor forfeit its corporate franchise, and that no penalty of any kind except the matter of costs was attached to like failures of other litigants, could it be said that the corporations received the equal protection of the laws? Take still another illustration: Suppose a law which, while opening the doors of the courts to all litigants, provided that a failure of any plaintiff or defendant to make good his entire claim or entire defense should subject him to a forfeiture of all his property or to some other great penalty, then even, if, as all litigants were treated alike, it could be said that there was equal protection of the laws, would not such burden upon all be adjudged a denial of due process of law? Of course, these were extreme illustrations, and they serve only to illustrate the proposition that a statute (although in terms opening the doors of the courts to a particular litigant), which places upon him as a penalty for a failure to make good his claim or defense, a burden so great as to practically intimidate him from asserting that which he believes to be his rights, is, when no such penalty is inflicted upon others, tantamount to a denial of the equal protection of the laws. It may be said that these illustrations are not pertinent because they are of civil actions, whereas this statute makes certain conduct by the stock yards company a criminal offense, and simply imposes punishment for such offense; that it is within the competency of the Legislature to prescribe penalties for all offenses, either those existing at common law or those created by statute; and, further, that, although that the penalties herein imposed may be large, yet obedience to a statute like this can only be secured by large penal-

ties, for otherwise the company, being wealthy and powerful, might defiantly disregard its mandates, trusting to the manifold chances of litigation to prevent any serious loss from disobedience. A penalty of a dollar on a large corporation whose assets amount to millions would not be very deterrent from disobedience. It is doubtless true that the state may impose penalties such as will tend to compel obedience to its mandates by all, individuals or corporations; and, if extreme and cumulative penalties are imposed only after there has been a final determination of the validity of the statute, the question would be very different from that here presented. But when the Legislature, in an effort to prevent any inquiry of the validity of a particular statute, so burdens any challenge thereof in the courts that the party affected is necessarily constrained to submit rather than take the chances of the penalties imposed, then it becomes a serious question whether the party is not deprived of the equal protection of the laws."

The evidence shows that one case under this provision of the act has already been tried in the superior court of Wake county against the complainant as a corporation and one of its agents at that place. In that case the court imposed a fine of $30,000 against the company, and notified the agent that, if he would stop selling tickets at a price that was authorized by the decree of this court, the judge would impose a nominal punishment, but, if he did not, the court would not say what it would do until it had received an answer. In making this reference the court does not wish to be understood as criticising the state court, for there is no one in the state for whom the court entertains a higher regard than Judge Long. It is also shown by the uncontradicted evidence in this case that at least 5,000 tickets are sold daily by complainant at its various offices in the state, in its intrastate business, thereby making it possible for it to be sued 5,000 times in one day for penalties amounting to $500 in each instance on account of its failure to comply with the statute fixing passenger rates. Thus it will be seen that by an enforcement of the statute judgments can be obtained against the complainant for the sum of $2,500,000 for each day. The aggregate penalties for which judgment could be obtained for one day would amount to a sum more than eight times as much as the sum involved in the original suit would be for one year.

This system of legislation is also condemned by Judge Lacombe, in the case of Consolidated Gas Co. v. Mayer (C. C.) 146 Fed. 150, and the conclusion is irresistible, from what this distinguished jurist has to say that such a system of penalties is unconstitutional and void. This not only applies to penalties in favor of individuals against the company, but also as to penalties against agents of the company which would render it utterly impossible for the company to carry on its business while having an orderly inquiry made by the courts as to its constitutional rights.

The court, therefore, is of the opinion that the section of the act attempting to impose penalties and fines is unconstitutional and void upon its face. For the reasons hereinbefore stated, the petitioner will be discharged. An order discharging the petitioners from the custody of the officers of the state court will be entered and a copy of the same will be certified to the police justice of the city of Asheville and the sheriff on Buncombe county.