CENTRAL TRUST CO v. NEW AMSTERDAM GAS CO. et al.

(Circuit Court, S. D. New York. February 18, 1909.)

DEPOSITS IN COURT (§ 11*)—DISPOSITION OF INTEREST ON DISTRIBUTION OF FUND.

An injunction pendente lite was granted at suit of gas companies restraining the enforcement of a reduced rate of charge for gas, but requiring the companies to deposit the excess collected above such rate with the master to await the final determination of the case. In the meantime the master realized some interest on the fund. Some 2½ years later the injunction was dissolved, and it became necessary to refund the amount so impounded to customers to the number of 873,000. *Held*, that the interest accumulation would be used in the first instance in paying the expense of administering the fund, especially as the cost of making distribution of the same among several million items would absorb a large part of it, and that no disposition of the excess remaining, if any, would be made until the amount of such excess was ascertained.

[Ed. Note.—For other cases, see Deposits in Court, Dec. Dig. § 11.*]

In Equity. On settlement of order vacating injunction pendente lite.

Joline, Larkin & Rathbone, for complainant.

Cortland Betts, for defendant New Amsterdam Gas Co.

Edward R. O'Mallay, for defendant Atty. Gen. of State of New York.

George S. Coleman, for defendant Public Service Commission, First District.

Francis K. Pendleton, for defendant City of New York.

LACOMBE, Circuit Judge. Defendants have submitted a clause "dismissing the bill," which is disallowed. The decision of the Supreme Court in the consolidated case does not warrant the granting of such relief at this time in the suits brought by the other companies.

If defendants should be hereafter advised to move for a dismissal of the bills for failure to prosecute, they may then present the question.

As to repayment of the fund, the special master had been instructed to take action in the matter before this motion was argued. See memorandum filed February 5, 1909.

As to interest, no question as to whether or not the gas company should pay interest at 6 per cent. per annum to any consumer is before this court; any such controversy, if such there be, will have to be adjusted in some other tribunal. At the very outset of this suit, when the preliminary injunction was issued, June 8, 1906, it was clearly and specifically pointed out that no consumer (except the city of New York) was made a party, and that none of them were or would be individually bound by any action which the court might take in such suit. No injunction was ever issued against any individual consumer; each one was left free to refuse payment of the overcharge if he chose to do so. Consolidated Gas Co. v. Mayer (C. C.) 146 Fed. 150; Richman v. Consolidated Gas Co., 186 N. Y. 213, 78 N. E. 871. Many consumers did so refuse, and have only paid at the 80-cent rate during the interval. So, now, if any consumer prefers not to take from the fund which the master is about to distribute the amount of his overcharge, but, on the contrary, elects to prosecute the company for the amount of such overcharge with legal interest, he is entirely free to do so. Whether or not the company would have any defense to such action would be decided by the court in which it might be brought.

All that we have to do with here is the return of the items of overcharge deposited with the special master to the true owners. While in his custody the fund earned some interest, not at the rate of 6 per cent.; 2½ per cent. was the utmost the master could obtain at any time, and not always that. These accumulations it is now suggested should be distributed ratably with the refunds as interest thereon. The order under which the deposit was made did not provide that this should be done. It was known at the time that there would be expenses of administration which would have to be borne by the fund itself, but which it was expected the accumulations would be sufficient to meet. Indeed, the present application recognizes that, and asks that only the amount in excess of expenses of administration be now distributed. The order required the gas company to prepare the papers for refund. This they have done, and filed them with the special master month by month. They disclose the exact amount of overcharge paid by each consumer, but to list up, check over, and audit the separate accounts so that no one will receive more or less than is due him is a work of great magnitude, and will be expensive. It was contemplated when the original order was made that the gas company would distribute the refunds through its collectors, week by week, as they made their rounds. At that time it was supposed there would be only the accumulations of a year to dispose of, but the fund has grown to such a size that any such method would be too dilatory, and the master will himself oversee distributions through the mails, reducing the time to a fraction of what it would be under

the original plan. The important thing is to get this overcharge back to each consumer in the shortest possible time and with no trouble to him.

Returning, again, to the question of distributing surplus of the accumulations above the expenses of administration. The master has had a careful calculation made in the case of the Consolidated Company; the relative proportions are the same in the other companies, and those figures may be referred to in considering all similar applications. Papers for refund submitted by the company show that there are 873,691 separate accounts. The distribution even of the total accumulations between this large number of different individuals would give but a trifling amount to each. · These accounts run back for a period of 33 months, and it is estimated that there will be an aggregate of over 20,000,000 separate items. The auditor, after an experiment as to the time required for making interest calculation as to a few items, estimates that in order to calculate the interest on these 20,000,000 items, varying in amount and date, and to check and audit these calculations, would cost, at 75 cents per hour, a sum which would nearly equal the whole amount of the accumulations. Apparently the persons who would get the most benefit from these operations would be the clerks employed to do the work. Moreover, if the vouchers now being prepared for distribution with the checks were held back until all these interest calculations could be made by 400 clerks, the time necessarily consumed would delay repayment for 2 or 3 months more.

These circumstances are mentioned merely to indicate some of the aspects of the question. Estimates are always unsatisfactory and often misleading. The present application can be disposed of without giving any consideration to them. As has been stated, all that is now asked is a distribution of so much of the accumulations as may be in excess of the expenses of administration of the fund. It is impossible to tell what that excess may be, or whether there will be any surplus at all. If all consumers had kept their receipts, a reasonably accurate estimate might be made as to what it will cost to prepare, check over, and audit the refund vouchers and to prepare and send out the checks. Undoubtedly, with such a vast number of items that expense will be very heavy, but its probable extent might be estimated with reasonable assurances of retaining sufficient to meet it. But from complaints which have come to the master and from investigations which have been made by gentlemen connected with the press, it is apparent that many unscrupulous persons have for some time past been persuading consumers to turn over their receipts and to make some arrangement or sign some paper, which they expect hereafter to present as evidence of an assignment to themselves and on which they will try to collect the money. It is known that in many instances these alleged assignments have been procured by deceit and false representations, in some instances even statements have been made that the individual soliciting the receipts was approved by the court, or was selected by the special master, the whole scheme being a fraud upon the consumer. The victims are presumably in most

instances not well to do, ignorant of their rights, often illiterate, and unfamiliar with the English language.

It is the duty of the master, so far as may be possible, to protect these unfortunate persons, who did not understand the importance of following the instructions which would have protected themselves, against being defrauded of the money which he holds for them. In many instances, although the individual amount is small, it may be a serious matter to the owner of the claim. This can be done only by inquiry and investigation, frequently by taking sworn testimony before the special master or some other. How many of these cases there may be no one can now tell; probably out of the 873,691 accounts they will run into the thousands or tens of thousands. No possible estimate of the cost of thus protecting the original fund for those rightfully entitled to it can now be made; it will undoubtedly be very large; it would not be surprising if the cost practically exhausted the accumulations. No one can now tell what surplus there will be after paying expenses of administration, if, indeed, there be any; and it would be unwise for the master to undertake to distribute any part of the accumulations from which alone he can meet the cost of a fight to protect the fund against fraudulent claims until the fight is over.

When the principal of the fund is distributed and the cost of that operation determined, the court will entertain whatever application may be made to it as to the disposition of any surplus of the accumulations.