CONSOLIDATED GAS CO. v. CITY OF NEW YORK et al.

(Circuit Court, S. D. New York. December 20, 1907.)

1. GAS—CONSTITUTIONALITY OF STATUTE FIXING RATES—SUIT TO ENJOIN ENFORCEMENT—VALUATION OF PROPERTY.

In a suit by a gas company to restrain the enforcement of a state statute regulating the price of gas as confiscatory and unconstitutional, in placing a valuation on complainant's tangible property employed in the business, on which it is entitled to earn a fair return, the actual or reproductive value at the time of the inquiry is the true measure, without regard to the original cost.

2. SAME—CAPITAL INVESTED IN BUSINESS—REAL ESTATE NOT USED.

Real estate owned by complainant, but not used in the business, should not be included as a part of the capital invested, unless it is shown that its use will necessarily be required in the near future; nor should the income derived from such land be included in the earnings, nor the taxes paid thereon in the expenses, of the business.

3. SAME—TITLE OF COMPLAINANT.

The complainant is entitled to have included in its capital the value of land of which it claims to be the owner, and actually in its possession and used by it in the business, although its title may be defective or subject to defeasance; but land in a river bed, over which boats approach the company's works, is of no greater value to the business, because owned by the company, than if owned by the public, and cannot properly be considered as employed in the business.

4. SAME—WORKING CAPITAL.

The complainant is entitled to include in its capital account as working capital in addition to the amount of its average bills payable outstanding, only so much cash as will enable it to safely and conveniently transact its business, having regard to its average losses and its standing as to credit.

5. SAME—PROPERTY OF SUBSIDIARY CORPORATIONS.

The complainant cannot legally include as a part of its capital devoted to the business of manufacturing gas, and affected by the statute regulating rates, the value of the property or stock of a coal and coke company of which it owns the entire stock, and which was organized by it to purchase and dispose of its by-products, nor of another gas company organized by it to manufacture and sell gas to it to supplement its own production; both such companies being separate and distinct corporations, in which its legal interest is as stockholder only.

6. SAME—METHOD OF DETERMINING VALUE OF INVESTMENT—CAPITAL STOCK.

Where the capital stock of such complainant was issued many years prior to the time of inquiry, and its capital is invested, not only in its business of manufacturing and selling gas, but also largely in the stock of other corporations, the amount of its share capital and its value in the market are of little or no value in determining its investment in the business on which it is entitled to earn a reasonable return; but such investment can only be reached by a valuation of the property employed in the business.

157 F.—54

**7. SAME—COST OF PRODUCTION OF GAS.**

In determining the cost to complainant of the production and distribution of gas, the cost of gas purchased by it from other companies and distributed through its pipes to supplement its own production is not a part of the expense of operation; but such purchase and distribution is a business to be separately considered.

**8. SAME.**

Amounts paid out by complainant as interest and penalty on taxes, the validity of which it contested in the courts, and the expenses of such litigation and of a legislative investigation, are extraordinary expenses, and cannot be treated as a part of the permanent and average expense of the manufacture and distribution of gas, to be deducted from earnings to ascertain the net profits of the business.

**9. SAME—RESERVE FOR DEPRECIATION OF PLANT.**

In such a suit complainant is not entitled, in addition to treating the amount actually expended during the time covered by the inquiry for repairs and renewals of plant as a permanent expense, to an allowance of a percentage of the gross income to be set aside as a reserve or contingent fund to cover depreciation of plant, which, together with the amount so actually expended, is largely in excess of the average expenditures for such purposes during a series of years, and which have maintained the plant in as good condition as in the beginning; but the total allowance should be based on such average.

**10. SAME—EARNINGS—SALE OF PURCHASED GAS.**

Where complainant, having insufficient gas of its own manufacture to supply its demand, purchased additional gas by contract from other companies, which it distributed through its pipes, and it appeared from the evidence that such purchases would probably continue, the net profits realized therefrom should be added to its income from its own production.

**11. SAME—REASONABLENESS OF REGULATION—RATE OF RETURN ON INVESTMENT.**

In ascertaining whether a statute or an order of a state commission fixing the maximum rate to be charged for gas by a gas company is unjust and unreasonable, and such as to work a practical destruction of the rights of property, which would render it unconstitutional, the return which the company is entitled to earn on the capital employed in the business is not determined by the legal rate of interest in the state, but by the local rate of return ordinarily sought and obtained on investments of the same degree of safety. A company having a long-established business and a practical monopoly in supplying gas in the most populous portion of New York City *held* entitled, as against such a statute, to a return of 6 per cent.

**12. SAME—PROPERTY INVESTED—GOOD WILL.**

In a suit by a gas company to enjoin the enforcement of a statute or regulation fixing the rate to be charged by such company for gas as unreasonable and confiscatory, where the company operates under a franchise, is required by law to furnish gas to all who demand it, and enjoys a practical monopoly in the territory which it serves, it has no good will in a property sense, aside from its franchise, which can be considered as property invested in its business.

**13. SAME—FRANCHISES.**

Under the settled rule of decision, however, that if property protected by a franchise is condemned and wholly taken from its owner the franchise must be paid for, such a state regulation reducing the earning power of property so protected reduces the value of the franchise pro tanto, and the complainant is entitled to add the value of its franchises, if ascertainable, to its capital account before declaring the rate of return permitted by the statute.

**14. SAME—VALUATION OF FRANCHISES.**

Complainant having followed the universal custom of American corporations, sanctioned by law, of capitalizing its franchises on its organization by issuing stock in excess of its actual investment in tangible property, and having since then earned fair dividends on all its stock, the amount of such excess stock may fairly be taken as the value of its franchises at the time of issuance, and where its business has largely increased such value may be assumed to have increased since that time in proportion to the increase in the value of its tangible property.

**15. SAME—TITLE TO FRANCHISES.**

Where complainant on its organization purchased the property and franchises of existing gas companies, and has since enjoyed and operated under such franchises, it acquired the legal ownership thereof under the decisions of the Court of Appeals of New York, and, notwithstanding the fact that the original grantees have ceased to exist, it is, for the purposes of an inquiry into the legality of a state statute regulating its rates of charge, entitled to capitalize their value, especially where the state has during such time compelled it to pay a franchise tax based thereon.

**16. SAME—CONSTITUTIONALITY OF STATUTE—COMMERCIALLY IMPOSSIBLE REQUIREMENTS.**

Laws N. Y. 1905, p. 2091, c. 736, Laws 1906, p. 235, c. 125, and the order of the state commission of gas and electricity of February 23, 1906, by all of which complainant gas company, supplying gas in the city of New York, is required to maintain a pressure of gas "in any service main in the city and at all distances from the place of manufacture in said city" of not less than 1 inch nor more than 2½ inches, are in respect to such provision illegal and void; it being shown that compliance with such requirement is commercially impossible by complainant, and that it could only so comply by the investment of a large amount of new capital in special equipment, which would add nothing to the earning power of its plants.

**17. SAME—UNREASONABLE PENALTIES.**

The provision of such statutes subjecting any gas company furnishing or selling gas in the city of New York to a penalty of $1,000 for every violation of their provisions respecting equipment, pressure, or rates of charge therein fixed is extravagant and unreasonable in its severity, and renders such statutes unconstitutional and void as a denial to such companies of the equal protection of the laws.

**18. COURTS—JURISDICTION OF FEDERAL COURTS—SUIT TO ENJOIN ENFORCEMENT OF STATE STATUTE.**

The fact that a regulation of rates to be charged by a public service corporation is made by a direct legislative act of a state, and not by a subordinate body, does not affect the jurisdiction or power of a court of the United States or of the state to inquire into its constitutionality.

**19. SAME—SUIT AGAINST STATE.**

A suit against the Attorney General of a state to restrain him as an officer of the state from enforcing by civil actions an unconstitutional enactment of the Legislature, as therein directed, to the injury of a private citizen or corporation in a matter in which the state has no pecuniary interest, is not one against the state, of which a federal court is denied jurisdiction by the eleventh constitutional amendment.

**20. INJUNCTION—PREVENTING MULTIPLICITY OF SUITS.**

A suit in equity may be maintained to enjoin the enforcement of an unconstitutional legislative act, the failure to comply with which would subject complainant to innumerable suits for penalties.

In Equity. Bill alleging the unconstitutionality of certain statutes of the state of New York, and of a certain order passed by the "Commission of Gas and Electricity" for the said state, pursuant to statutory authority.

Charles F. Mathewson, John A. Garver, and James M. Beck, for complainant.

Francis K. Pendleton, Corp. Counsel, and Alton B. Parker, William P. Burr, and William J. Clarke, for city of New York.

Alfred R. Page, William A. Deford, and David B. Hill, for Atty. Gen. Wm. S. Jackson.

Abel E. Blackmar and Edward B. Whitney, for Public Service Commission.

## History of the Litigation.

HOUGH, District Judge. By chapter 736, p. 2091, Laws 1905 (Sess. Laws N. Y.), all corporations or persons engaged in the business of furnishing or selling illuminating gas in the city of New York were forbidden to charge said city a higher price therefor than 75 cents per 1,000 cubic feet. The same act required that all gas so sold should have a specified illuminating power, and also that the pressure of such gas in any service main in the city, and at all distances from the place of manufacture in said city, should not be less than 1 inch nor more than 2½ inches. It was further provided that any person or corporation violating any provision "of this act shall forfeit the sum of $1,000 for each offense." Chapter 737, p. 2092, Laws 1905, created the "Commission of Gas and Electricity," and among other powers gave the commission that of entertaining written complaints signed by more than a hundred customers of any gas company, or by the chief executive officer or officers of a city or other municipal organization; to examine by public hearing into the propriety of the price charged by said company for its product, and after such hearing to fix "the maximum price of gas * * * which shall be charged by such corporation in such municipality." The commission had also authority granted to it, to fix the standard of illuminating power of gas manufactured and sold in any municipality; as also the standard of pressure thereof; provided such standard of illumination should not be less than that prescribed by law, and that the establishment of a standard of pressure should only be made where it was not otherwise legally prescribed. In pursuance of these powers, the commission on February 23, 1906, made an order specifically affecting this complainant, and requiring that on and after May 1, 1906, the maximum price for gas furnished within the borough of Manhattan in this city be fixed at 80 cents per 1,000, and also requiring this complainant to furnish gas with an illuminating power of not less than that prescribed by the first statute referred to, and likewise requiring it to maintain the pressure provided for by said statute.

On April 3, 1906, the Legislature enacted chapter 125, p. 235, of the Laws of that year, which fixed the price of gas for all persons or corporations manufacturing, furnishing or selling the same in the borough of Manhattan at 80 cents per 1,000, and also made applicable to gas furnished by any person or corporation in said borough to private consumers the same regulation as to illuminating power and pressure which in the previous year had been applied to gas consumed by the municipality. This act also declares that the violation of any provision thereof shall occasion the forfeiture of "the sum of $1,000 for each

offense to the people of the state." On the same day that the Gas Commission's order became operative, i. e., May 1, 1906, this action was begun by the company especially affected, which is also the principal gas manufacturing and supplying company, doing business in the borough of Manhattan. The parties defendant to this proceeding are the Attorney General of the state and the district attorney of New York county; they being the officers upon whom is imposed the duty by section 1962 of the New York Code of Civil Procedure to institute suits for the recovery of the penalties prescribed by the statutes referred to. The city of New York and the several members of the commission, the constitutionality of whose order is attacked by the bill, were the remaining original defendants. During the pendency of the suit, the Commission of Gas and Electricity was abolished, and all its powers and duties transferred to a new board, known as the "Public Service Commission," which last is specifically charged by recent legislation with the enforcement of orders made by the old commission, and therefore with the enforcement of the order complained of. The Public Service Commission has appeared in this action in the place and stead of the defunct Gas Commission. An injunction pendente lite issued herein restraining the enforcement of the said statutes and order (146 Fed. 150), and as of July 5, 1906, an order of reference was made to Arthur H. Masten, Esq., as special master, "to take all the testimony herein, make all needed computations, and fully find the facts." For nearly a year the cause proceeded before the master, who on June 24, 1907, filed his report, and the cause is now before the court on final hearing under complainants' motion that an order be now made "overruling the exceptions to and confirming the master's report herein"; and complainants also move for a "final decree in accordance with the prayer of the bill."

### The Issues in the Case.

The complainants seek to enjoin the Attorney General and district attorney from prosecuting under the penalty clauses in the statutes above referred to, to enjoin the city of New York from insisting upon the 75-cent rate given it by the act of 1905, to enjoin the Public Service Commission from enforcing said order of the Gas Commission, and to attain these objects because: (1) The 80-cent gas rate is substantially confiscatory; (2) the two statutes taken together are unconstitutionally discriminatory; (3) the penalty clauses in both statutes are so oppressive as to be unconstitutional; (4) the provisos regulating pressure in the mains are (under commercially possible conditions) impossible of fulfillment, and therefore illegal; and (5) the legislative power was by the statute creating the Gas Commission improperly and unlawfully delegated to that body.

### The First Question of Fact Tried Before the Master.

The report states this inquiry is to "ascertain the value of the assets employed in the production and distribution of the gas sold by complainant." This is obviously an inquiry preliminary and vital to ascertaining whether the 80-cent rate for the sale of gas yields any return at all. The report states that such assets consist of:

### Tangible Assets.

| | |
|---|---:|
| Real estate.............................................................. | $13,461,000 |
| Plant ................................................................. | 15,500,000 |
| Mains ................................................................. | 12,636,000 |
| Services ............................................................... | 1,994,000 |
| Meters and miscellaneous................................................ | 4,100,000 |
| Working capital........................................................ | 3,616,000 |
| Coal & Coke Co......................................................... | 50,000 |
| Astoria establishment, representing capital invested in production of gas secured from other companies..................... | 12,000,000 |
| | $63,357,000 |

### Intangible Assets.

| | |
|---|---:|
| Franchises and good will................................................ | 20,000,000 |
| Total assets........................................................... | $83,357,000 |

The disputed questions involved in this finding (so far as tangible property is concerned) are three: First, whether the values ascribed to the several enumerated items of property are based upon competent and persuasive evidence; second, whether the method of valuation pursued by the master is in accordance with law; and third, whether (assuming said items of property to be possessed and enjoyed by complainant) they are "employed" (within the legal signification of that word) in the production and distribution of gas.

From an examination of the expert testimony submitted, and giving due weight to the careful and able report of the master, it is clear that the first query must be answered affirmatively, and it be found that complainant was, when this action began, in the possession and enjoyment of property of the kind and value above set forth. The question first stated, and just answered, is wholly one of fact; · but the second and third are largely, if not entirely, questions of law.

### Method of Valuation.

As to the realty, the values assigned are those of the time of inquiry; not cost when the land was acquired for the purposes of manufacture, and not the cost to the complainant of so much as it acquired when organized in 1884, as a consolidation of several other gas manufacturing corporations.

It is objected that such method of appraisement seeks to confer upon complainant the legal right of earning a fair return upon land values which represent no original investment by it, does not indicate land especially appropriate for the manufacture of gas, and increases apparent assets without increasing earning power. Analogous questions arise as to plant, mains, services, and meters; the reported values whereof are the reproductive cost less depreciation, and not original cost to the complainant or its predecessors.

It appears by undisputed evidence that some of these last items of property cost more than new articles of the same kind would have cost at the time of inquiry; that some are of designs not now favored by the scientific and manufacturing world, so that no one now entering upon a similar business would consider it wise to erect such machines or obtain such apparatus. In every instance, however, the value assigned in the report is what it would cost presently to reproduce each

item of property, in its present condition, and capable of giving service neither better nor worse than it now does. As to all of the items enumerated, therefore, from real estate to meters, inclusive, the complainant demands a fair return upon the reproductive value thereof, which is the same thing as the present value properly considered. To vary the statement: Complainant's arrangements for manufacturing and distributing gas are reported to be worth the amounts above tabulated if disposed of (in commercial parlance) "as they are."

Upon authority, I consider this method of valuation correct. What the court should ascertain is the "fair value of the property being used" (Smyth v. Ames, 169 U. S., at page 546, 18 Sup. Ct., at page 434 [42 L. Ed. 819]); the "present" as compared with "original" cost; what complainant "employs for the public convenience" (169 U. S., at page 547, 18 Sup. Ct., at page 434 [42 L. Ed. 819]); and it is also the "value of the property at the time it is being used" (San Diego Land Co. v. National City, 174 U. S., at page 757, 19 Sup. Ct., at page 811 [43 L. Ed. 1154]). And see, also, Stanislaus Co. v. San Joaquin Co., 192 U. S. 201, 24 Sup. Ct. 241, 48 L. Ed. 406. It is impossible to observe this continued use of the present tense in these decisions of the highest court without feeling that the actual or reproductive value at the time of inquiry is the first and most important figure to be ascertained, and these views are amplified by San Diego Land Co. v. Jaspar (C. C.) 110 Fed., at page 714, and Cotting v. Kansas City Stock Yards (C. C.) 82 Fed., at page 854, where the subject is more fully discussed. Upon reason, it seems clear that in solving this equation the plus and minus quantities should be equally considered, and appreciation and depreciation treated alike. Nor can I conceive of a case to which this procedure is more appropriate than the one at bar. The complainant by itself and some of its constituent companies has been continuously engaged in the gas business since 1823. A part of the land in question has been employed in that business for more than two generations, during which time the value of land upon Manhattan Island has increased even more rapidly than its population. So likewise the construction expense not only of buildings, but of pipe systems under streets now consisting of continuous sheets of asphalt over granite, has enormously advanced.

The value of the investment of any manufacturer in plant, factory, or goods, or all three, is what his possessions would sell for upon a fair transfer from a willing vendor to a willing buyer, and it can make no difference that such value is affected by the efforts of himself or others, by whim or fashion, or (what is really the same thing) by the advance of land values in the opinion of the buying public. It is equally immaterial that such value is affected by difficulties of reproduction. If it be true that a pipe line under the New York of 1907 is worth more than was a pipe line under the city of 1827, then the owner thereof owns that value, and that such advance arose wholly or partly from difficulties of duplication created by the city itself is a matter of no moment. Indeed, the causes of either appreciation or depreciation are alike unimportant, if the fact of value be conceded or proved; but that ultimate inquiry is oftentimes so difficult that original cost and reasons for changes in value become legitimate subjects of inves-

tigation, as checks upon expert estimates or bookkeeping inaccurate and perhaps intentionally misleading. Cf. Ames v. Union Pacific R. R. (C. C.) 64 Fed., at pages 178, 179. If 50 years ago, by the payment of certain money, one acquired a factory and the land appurtenant thereto, and continues to-day his original business therein, his investment is the factory and the land, not the money originally paid; and unless his business shows a return equivalent to what land and building, or land alone, would give if devoted to other purposes (having due regard to cost of change), that man is engaged in a losing venture, and is not receiving a fair return from his investment, i. e., the land and building. The so-called "money value" of real or personal property is but a conveniently short method of expressing present potential usefulness, and "investment" becomes meaningless if construed to mean what the thing invested in cost generations ago. Property, whether real or personal, is only valuable when useful. Its usefulness commonly depends on the business purposes to which it is or may be applied. Such business is a living thing, and may flourish or wither, appreciate or depreciate; but, whatever happens, its present usefulness, expressed in financial terms, must be its value.

As applied to a private merchant or manufacturer, the foregoing would seem elementary; but some difference is alleged to exist where the manufacturer transacts his business only by governmental license —whether called a franchise or by another name. Such license, however, cannot change an economic law, unless a different rule be prescribed by the terms of the license, which is sometimes done. No such unusual condition exists here, and, in the absence thereof, it is not to be inferred that any American government intended, when granting a franchise, not only to regulate the business transacted thereunder, and reasonably to limit the profits thereof, but to prevent the valuation of purely private property in the ordinary economic manner, and the property now under consideration is as much the private property of this complainant as are the belongings of any private citizen. Nor can it be inferred that such government intended to deny the application of economic laws to valuation of increments earned or unearned, while insisting upon the usual results thereof in the case of equally unearned, and possibly unmerited, depreciation.

I think the method of valuation applied by the report to land, plant, mains, services, and meters lawful. To "Working capital, Coke & Coal Co. and Astoria" the above considerations are not applicable, and these items will be treated separately.

### The Employment of Certain Items of Realty in the Manufacture and Distribution of Gas.

It is not doubted that all the meters, services, mains, and plant possessed and enjoyed by complainant, and of the value already considered, are employed in complainant's gas business. I am not able to arrive at the same result in respect of all the real estate. Ownership is asserted in land on Manhattan Island worth upwards of $15,-000,000; some of it so obviously held for purposes other than the manufacture or distribution of gas that no serious endeavor has been made to include the same in the property upon which the gas business should

yield to complainant a fair return. There remain, however, properties included in the report, fairly to be described as large tracts of land, the inclusion of which is justified upon the ground that complainant is entitled not only to a return upon that which it presently uses, but also upon something more which it may require for similar use in the near future. How near that future may be is not shown, nor even intimated as to most of the disputed items, and it may fairly be said that, in a suit such as this, proof of necessity near at hand should be required.

But there is one argument to me conclusive of the question raised by defendant's objections to the insertion in capital account of the items termed in the report "land leased, vacant and unimproved," a phrase which includes most of the disputed items just referred to. Such argument rests upon a consideration of complainant's general business as explained by the testimony and briefs, of the necessities of its present situation, and of recent actual occurrences in respect of the Astoria plant (hereafter to be more fully treated), which considerations convince me that there is no intention on complainant's part to extend or enlarge its gas business on Manhattan Island in such manner as to require any substantial addition to the lands already actually applied to the necessities of that business. It is clear that for complainant to endeavor so to do would be unwise; it being apparent from any set of values propounded by any party hereto that a great, if not the greatest, obstacle to the cheaper yet profitable production of gas on Manhattan Island, is the enormous value of the land already necessarily devoted to that purpose; and that any more island real estate will be so used the testimony does not compel me to believe. The folly, and therefore the improbability, of such a course is shown by one undisputed fact, viz., the present value of the real estate now confessedly devoted to gas making on Manhattan Island is over $11,-000,000, as found by the master, yet at the present price of $1 a 1,000 the gross yearly income derived from the maximum production of everything on that $11,000,000 worth of land is less than $10,-500,000. That the greatest product of which a plant is mechanically capable is yearly worth less than the value of the land on which it stands is a fact that speaks for itself, and needs no argument to prove that no man of business sense will increase such a business misfortune.

Nor is it improper for the court to take cognizance of contemporary local history, some details of which are in the evidence, and to recognize a determination on the part of the inhabitants of this island to render difficult even the continuance, in so crowded a city, of a business which, in the language of one of complainant's witnesses, "renders us at best unpleasant neighbors."

For these reasons, I deem the plea advanced by complainant for the addition to its capital account of any Manhattan Island land not now used for gas producing purposes legally invalid, and I exclude from the land valuation the present worth of leased, vacant, and unimproved land, in the amount of $2,141,155. From the exclusion of these items, it necessarily follows that they should be regarded as no part of the complainant's Manhattan Island gas plant, and that therefore there must also be excluded from the legitimate expenses of the

company the taxes upon these lands, and from its income, the rental derived from such as were leased at the time of inquiry. To this conclusion I am the more willing to arrive on observing that the only yearly revenue produced to the complainant by this $2,000,000 worth of New York real estate was about $37,000. It has not been overlooked that many of the pieces of land just considered are adjacent to portions of the plants of the complainant, and that as to some a definite purpose of utilization is testified to; but the fact remains that they have been held for very considerable periods and not used, that they ought not to be used for the economic reasons above given, and that the testimony regarding their probable use falls far short of establishing that necessity which can be the only excuse for the utilization of such an expensive luxury as Manhattan realty in the gas business of the complainant.

### Lands Alleged Not to be Owned by Complainant.

Defendants also object to complainant treating as part of its invested capital certain lands and land under water of which its ownership is denied. It appears that complainant, many years ago, acquired possession of these lands, under deeds which in terms obliged it to reserve certain portions therefrom as public streets, or to vacate said portions for street purposes, whenever thereunto required by the city of New York. At the time of the conveyances, much of the land in question appears to have been under water; most has long since been filled in; the streets have never been opened, nor has any demand for such opening ever been made by the city; and most of the filled in property, affected by this objection, is not only in complainant's possession, but is occupied by gas manufacturing establishments. It may be that complainant is liable to an action of ejectment, or that by process of condemnation these pieces of property could be taken from it without compensation, upon the street opening being duly declared; but in my judgment it has given prima facie proof of title. If it were not occupying this debatable property, it would have been occupying either some of the lands already excluded as not employed in the gas business, or other lands of substantially equal value in the vicinity of its plants, for there is no contention that the land in question, however indifferent the title thereto, is not necessary for and actually used in complainant's business. The case is not different from what it would have been had defendants shown, not that the city threatened complainant's title, or claimed that it had none, but that any third person had better title to the premises than the complainant, and might at any moment bring a successful action of ejectment therefor. It seems to me that in a proceeding of this kind such evidence would have been wholly immaterial.

But these considerations are not relevant to certain land under the East river in the neighborhood of Tompkins street. The title to that land under water may be as good or bad as that to the region intended, more than 40 years ago, to be devoted to streets and not yet used for that purpose. But I cannot think that the land now in question, and under water, is employed in complainant's gas business, in any proper sense. If it be assumed that the land is owned in fee, it can be used

for no other purpose than as a river bed, upon the surface of which water-borne freight approaches complainant's yards. The land under that river is of no more use to the complainant because it is owned by it than it would be were it owned by the city or the state of New York. It is the privilege of transportation over the river—which is open to all—that is valuable, and not the alleged ownership of the mud thereunder. I therefore exclude from the reported real estate valuation the value of said land under water, viz., average valuation of complainant's witnesses, $160,000. Subtracting these deductions, aggregating $2,301,155, from the reported value of the realty, viz., $13,461,-000, I find the value of complainant's real estate actually used in the business under consideration to be $11,155,845.

## Working Capital

Upon this subject, I am unable to agree with the report, further than to express my belief that the complainant usually has on hand about $3,000,000 worth of bills receivable and cash, and some $616,000 worth of bills payable outstanding. But it does not follow that so large a proportion of its capital account should be entered as working capital. That phrase means the amount of cash necessary for the safe and convenient transaction of a business, having regard to the owner's ordinary outstandings both payable and receivable, the ordinary condition of his stock, or supplies in hand, the natural risk of his business, and the condition of his credit; and unless these matters, and perhaps others, be looked into, no comparison can be drawn between one business and another, or even between those of the same general nature. The security of complainant's business is fairly shown by the fact that for the time of inquiry, in a gross business of over $13,000,-000, bad and doubtful debts amounted to less than $83,000, and final profit and loss adjustment less than $30,000.

Complainant's credit is of the highest, and its own comptroller should, I think, be the best judge of its own necessities, and his measure of working capital in the sense of cash is $1,000,000. $616,000 is taken as a fair average of outstanding bills payable, and the aggregate of these two sums is as much as the comptroller claimed until on suggestion he added $2,000,000 thereto, to represent the average amount of outstanding bills receivable. To assert that a concern with such credit as complainant, with small percentage of loss, and a plant completed and paid for, needs as working capital not only the amount of its average outstandings payable and $1,000,000 in cash, but enough more to make its average bills receivable equal to cash, is going too far. A fair working capital for complainant is $1,616,000, and that figure is adopted.

## Coal & Coke Company and Astoria Establishment.

The first of these items denotes complainant's method of disposing of coke, and some other by-products. Such disposition is made through a corporation legally independent, but whose entire stock is owned by complainant. The by-products in question are sold to such corporation, whose capital stock is the $50,000 reported, and on that capital

stock complainant receives a 10 per cent. dividend which is entered in the income account. .

The second item represents a method of capitalizing, for the purposes of this case, the gas heretofore purchased by complainant from other manufacturing gas companies in or near Manhattan. It appears that, for the period of inquiry, the maximum product of complainant's own works was about 10,500,000,000 feet per annum. It has sale for about 3,000,000,000 feet more, and this additional quantity it bought from other gas companies, whose stock was, at the time of purchase, and still is, either wholly or partly owned by complainant. This condition was looked upon both by complainant and the vendors of the gas (so far as the latter had any independent view at all) as temporary, and, while this cause proceeded before the master, complainant was erecting on Long Island a plant of the most modern construction, capable of furnishing not only the annual 3,000,000,000 feet of gas purchased from other producers, but 1,000,000,000 feet more. Such projected addition to the gas-making equipment of New York and vicinity was to be, and was while in process of construction, the property of the Astoria, Light, Heat & Power Company, all of whose stock was and is owned by the complainant, and whose works will when completed be as completely identified with complainant's enterprises as is the comparatively insignificant Coal & Coke Company.

Complainant therefore claims that, because the Coal & Coke Company is no more than its "Cartage department," and the Astoria Company will be no more than a gas plant capable of supplying it with what it has hitherto been obliged to buy from others, therefore both should be here regarded as much a part of complainant's assets as any retort or holder of its plant. To me it is clear that this procedure is without warrant of law. Complainant does not employ in its gas manufacturing business a single tool of the Coal & Coke Company, nor a single machine of the Astoria Company. Its investment in those companies is represented legally by so many certificates of stock; its relation to them is that of a stockholder only; each is bound by law to maintain a separate existence and conduct a separate business. The argument ab inconvenienti is often strong, and it has been inquired here: Why should complainant be bound to go through the idle form of taking money out of one pocket merely to put it in another, and treating (for example) the Astoria Company as an independent organization, when it really is not? The sufficient answer to this argument is that the law does not permit this species of convenience, and, while it still does permit the existence of many controlled corporations, it is highly necessary for the proper investigation and possible regulation of all corporations, affected by a public use or engaged in interstate commerce, that the affairs of the controlling and controlled organization shall be kept distinct. And just what complainant, doubtless from very good business motives, is endeavoring here to have recognized by the court, is in my judgment plainly against public policy.

In the case of the Astoria Company, it is also, I think, a sufficient answer to the capitalization proposed that there was no such company actually doing any business during the period inquired into. It had a legal existence, and the complainant was in effect subscribing to its

stock; but it had no manufacturing agreement with complainant, and was an enterprise incomplete and merely projected.

Further, there is no better reason for this suggested capitalization than there would have been had the Astoria plant never been planned, and complainant looked forward to permanent purchases from its other controlled corporations. In the New Amsterdam Gas Company complainant is almost the only shareholder, and from that corporation much of complainant's extra gas was obtained. It might just as well be asked that some portion of the plant of the New Amsterdam Company, i. e., that part which by hypothesis was sufficient to manufacture the gas sold by it to complainant, should be capitalized, as representing something upon which complainant was entitled to a fair return from its gas manufacturing and distributing business. Because, therefore, the proposed capitalization of the two items now under consideration is contrary to law, is not, in the case of the Astoria Company, based upon any actually existing investment at the time of inquiry, and because it is misleading, in not truly stating the facts, these capital items are excluded.

It results, from these findings, that the value, as of the time of the beginning of this suit, of complainant's tangible property, invested in and representing the business sought to be regulated by the statutes and order in question, is as follows:

Real estate.................................................$11,155,845
Plants .................................................... 15,500,000
Mains .................................................... 12,636,000
Services ................................................. 1,994,000
Meters and miscellaneous.................................. 4,100,000
Working capital........................................... 1,616,000
                                                         _____

Total of tangible assets..................................$47,001,845

In seeking an answer to the ultimate question in litigation such as this, i. e., what is the capital (in the sense of assets, not share capital) upon which the complainant is entitled to a fair return, the other inquiries suggested by Smyth v. Ames, supra, have not been forgotten. But in this cause I do not find that the original cost (where ascertainable) of complainant's tangible property affords any assistance. The time of acquisition is too long ago, and conditions have so wholly changed as to render comparisons useless. Nor is any consideration of share capital advantageous. Were the complainant engaged in no other business than manufacturing and distributing gas on Manhattan Island, the extent, value, time, and cause of issue of its share capital would be material and relevant inquiries. But its holdings of the stocks of other companies (both those engaged in gas lighting and heating, and in other pursuits) are so extensive that it is impossible to say more than that its entire capitalization does not seem disproportionate to its entire business. How much of said capitalization is represented, or should properly be represented, by its own gas manufacturing business, can only be ascertained by a valuation of its assets. And the only portion thereof that has been, or can be, valued herein, is so much as is affected by the regulation complained of.

Nor do I think the price, as shown by recorded quotations, paid

for the stock and securities of complainant during the last 20 years, is of the slightest value. The stock has apparently been at times the subject of speculation, the recorded prices have varied so widely as to render any safe conclusion impossible, and the only result I can reach, from the consideration of these figures, is that at times the recorded prices are out of all proportion to the possibilities of the gas business, and at other times have reflected unwarranted lack of confidence in the possibilities of the same. Having pursued therefore, as did the master, what I believe to be the only method of investigation practicable in this case, I conclude that complainant is entitled, as matter of law, to a fair return, from the business of manufacturing and selling gas, on $47,000,000 worth of tangible property.

### The Second Question of Fact Tried Before the Master, i. e., Cost to Complainant of Production and Distribution of Gas.

Complainant's method of proving expense of manufacture and operation is to show actual disbursements for the year ending October 31, 1905, and for the calendar year 1905. The items in detail are shown in the report. No reason appears to doubt that these disbursements were made during the times specified and for the purposes set forth. Whether the purpose for which any particular sum was expended related solely or partly to the gas business is not wholly a question of fact, when the circumstances are known, and it is always to be remembered that the ultimate use of this cost statement is not to prove what it cost complainant to make and distribute gas in 1905, but what, under ordinary circumstances, and with a reasonable allowance for contingencies, will be such expense in the near future.

To the method pursued, it is objected that the investigation covered too short a period. If the statement propounded had not been compared, as to its most important items, with the experience of former years, and with that of other companies in other cities, there would be more force in the argument; but as matters are I think the court had been furnished with sufficient facts. A summary of what complainant deems its ordinary annual operating expenses may be condensed from the report, as follows:

Cost of gas at station (i. e., ready for delivery to holder).......$3,445,091 37
Net cost of gas purchased from other companies.............. 893,432 49
Cost of distribution (i. e., from factory to consumer).......... 1,589,700 67
General expenses........................................ 2,807,040 66

Total .............................................$8,746,265 19

It appears to me that this method of statement is in one respect misleading, and that some of the objections to the general expense account are well founded.

### The Method of Statement.

The item "Cost of gas purchased from other companies" is not, in any way, an expense of operating complainant's gas factories or distributing its own gas. Much time was spent in showing the amount of each subitem of station, distribution, and general expense per 1,000 feet of gas manufactured and sold. In making these computations,

complainant has apportioned its distribution and general expenses, not to the gas it manufactured, but the gas it sold, including that bought (as hereafter more fully stated) at bare station cost from other companies. This procedure apparently reduces the price per 1,000 cubic feet, by increasing the number of units to which expenses other than station cost are apportioned, and conceals the actual cost of manufacturing and distributing the 10,500,000,000 feet, which represent the maximum capacity of complainant's own works.

It is hardly too much to say that this procedure was the excuse for attempting to increase the tangible assets of the capital account, by adding the Astoria plant, and there is an apparent injustice or illogicability in considering income and receipts and disbursements, unrelated to any item of capital. Something seemed necessary to represent the investment from which flowed the profits of selling purchased gas. It appears, however, that it would have cost substantially as much to distribute the 10,500,000,000 feet, which complainant made, as it did to distribute the 13,500,000,000 feet sold during the period of inquiry. It entailed no measurable expense to pass the additional 3,000,000,000 feet through holders, mains, and services, and the fact is that the business of selling purchased gas was proportionately far more profitable than that of selling gas of the vendor's own manufacture. The two operations should be regarded as separate, though related, businesses, and, having ascertained the tangible assets engaged in both manufacture and distribution, it is logical next to discover the normal expense of distributing the product of those tangible assets, before taking up any other branch of business. From the statement of complainant's operating cost, therefore, I think the item of "Gas purchased from other companies" should be eliminated.

### Specific Objections to Items of General Expense.

Interest on taxes, $94,506.29: Doubtless this expense was incurred in 1905, and as a penalty for withholding certain taxes laid by the state of New York, which have been and still are being contested either as to amount or validity. The propriety of complainant's action in withholding payment has been attacked; but I think without success, considering the present condition of the tax laws of this state, and the results flowing from a voluntary payment of contested taxes. But in such litigation as this there is an insuperable difficulty in allowing this item, viz., it is not and cannot be a permanent expense. The effect of allowance would be to regard this sum as a part of the usual running expenses of the business, and, whether in the future taxes were or were not paid when due, to fix this disbursement as a permanent item of expense in the manufacture of gas for an indefinite period.

Of the same nature is the cost of a legislative investigation into the gas business, a sum expended in 1905, and amounting to $25,671.74. A third and similar item, is the expense of litigation over franchise taxes during the same year, being the amount ($63,401.65) expended in attacking the validity of chapter 712, p. 1589, of the Laws of New York for 1899, and the propriety of taxes laid thereunder. In 20 years

legislative investigations have been few, and the validity of the franchise tax law has been established by the Supreme Court of the United States. The effect of allowing the last three items is to capitalize them, and the statement of that result is enough to require their disallowance.

As pointed out while considering the real estate item of capital account, complainant cannot treat as property employed in its gas business real estate not actually used, nor clearly shown to be intended for immediate use in such business. It follows that the expense of property not so employed cannot be treated as a permanent item of expense of manufacturing and distributing gas. For this reason the general expense account must be further lessened by the proportion of taxes paid upon such realty, computed as $29,071.

### The Principal Objection to Complainant's Statement of Operating Cost.

This may be conveniently called the "10-cent item." It is admitted that some allowance must be made for the accidents and contingencies of this, as of any other business, and complainant therefore demands that, in addition to treating as permanent disbursements what it actually paid out during the period of inquiry for repairs and renewals to its plant, mains, services, and meters, there should be allowed to it a reserve or contingent fund of 10 cents per 1,000 feet of gas sold, or, at the existing price of a dollar a thousand, substantially 10 per cent. of its gross income. This method of stating the 10 per cent. reservation is misleading, and I think unjust to the state. The more gas complainant buys from other companies, the greater its volume of sale; but, as pointed out, the expense of maintenance does not increase pari passu with increased sales; and the allowance, if granted at all, should be upon the sale price of the maximum production of complainant's own works. This deduction alone would amount to more than $150,000.

The nature of this "10-cent item" may be seen by observing that during 1905 there was actually expended for repairs and renewals, and included in station and distribution cost, the sum of $685,077.47, and this item is to be considered as a permanent allowance for repairs and renewals, amounting, according to the report, to 5.58 cents for every thousand feet of gas sold, including, of course, the gas purchased from other companies. Yet, in addition to this allowance, there is demanded, in permanence, an additional 10 cents per unit sold, amounting to $1,328,316.37, to cover the probability of annual repairs and renewals in excess of $685,077.47, and depreciation, mediate and ultimate, by which is meant the final replacement of plant and apparatus owing to irreparable decay. This item has been the subject of bitter contest, and after much hesitation I am unable to concur in the report.

It appears upon a review of sales of gas, and cost of repairs and renewals actually made, between 1885 and 1905, that the average expenditure for such purposes during that time was 10.89 cents per 1,000 feet of gas sold. Since 1899 the product of complainant's factories has not been sufficient to satisfy its consumers, and the average, if computed only upon gas manufactured, is somewhat higher, but not

over 11 cents per 1,000. This average of repairs and renewals has for 20 years been sufficient, not only to maintain the plant in a condition of ordinary excellence, but to enable complainant to-day to make more and better gas than ever before, while owning a better plant than ever. The actual payments for these purposes have often, as in 1905, fallen far below this average. This shows that the expenditure is not constant, while the retention of the large percentage demanded would be so under the plan urged on the court. There are certainly legitimate and gainful purposes to which temporarily unexpended balances can be put; and if they are so used an 11-cent reservation on gas manufactured will mean, during the years, much more than 11 cents kept, pending larger demands from the works, without profit from its use.

Again, the 10-cent item may be thus analyzed: In 1905 there was charged to depreciation $282,219.67, while there was expended on new construction $621,264.36, a difference of $339,044.69. Construction represents actual outgo, is chargeable to principal, and must be provided for either by new capital, or—what is the same thing—a capitalization of earnings, or by borrowed money. It is not pretended that, as against a regulatory statute, new construction must be allowed for out of current earnings. Yet under the system of bookkeeping above outlined and shown in the evidence what happened in 1905 was this: The $621,264.36 was expended. Then a year's depreciation was fixed by estimate at $282,219.67, and that amount of construction expenditure was charged to income as depreciation, and is sought to be covered in this 10-cent allowance. The distinction between depreciation of that kind and new construction seems to me very shadowy.

On considering the 20-year average of repairs and renewals, it is observable that the consumption of gas has in that time nearly quadrupled, and the capacity of complainant's own works very largely increased. It follows that the 10.89 percentage, if computed upon the sales for 1885, represents a much smaller sum than does the same percentage on the product of 1905. Yet the number of plants has not increased with increased production. Neither, proportionately, have miles of mains and most other parts of distributing property. Each plant turns out more gas, through interior enlargement and improved methods of production, and there is nothing in the evidence to compel the belief that the same proportion of repair and renewal expenditures to volume of product existed in 1905 as did in 1885, or that the proportion of earlier years is legitimately to be required in the future. And this is true although the amount of money lately expended, and to be expended, is much larger than 20 years ago.

The actual result of this demand, as applied to the facts of 1905, is as follows: If the 10 per cent. reserve were computed only on gas manufactured, it amounted to $1,065,781.03 of cash in hand. Of this $282,219.67 passed to depreciation and was actually used to lessen expenditure for new construction, and the balance of $783,561.36 should have been credited to reserve against future contingencies. This means

that if repairs and renewals could be kept at the figure of 1905, and no more be called depreciation than was used to aid in construction in that year, there would be produced without the aid of investment at interest a fund sufficient to reconstruct complainant's entire plant in 20 years.

No such thing will probably happen, and counsel have argued that this apparent surplus is prospectively dissipated by future increased expenses, and losses of many kinds. Increased expenses are likely to be incurred. The constant rise in the price of most materials and most kinds of labor is something of which even judicial cognizance may be taken; but this inquiry is solely into the reasonableness, and therefore the legality, of the regulatory action in 1906. It is not to be presumed that if circumstances change the regulation will remain unchanged. And if such regulation does remain unchanged, there is nothing in the law as developed down to this time to prevent application to the courts, years after the passage of the regulative statute, upon the ground that what was just when the statute was passed has become unjust by lapse of time and change of circumstances.

As to future losses of a kind not known in the past, such may well be encountered. It is said, probably with truth, that the crowded condition of underground New York increases for the future the danger of explosion, and introduces a new peril in electrolysis resulting from the multiplication of underground electric currents. These are dangers possible, so, somewhat more remotely, are lightning and earthquake. But it cannot be said, as matter of law, that a corporation, even as against its shareholders, has the right to hoard income for the sake of maintaining dividends in years when extraordinary disasters may occur. If a prosperous private corporation chooses to set aside for such contingencies an annual fund of 10 per cent. of gross earnings, discontented minority stockholders might not be able to coerce the discretion of the directors by judicial proceedings; but their complaint would be entitled to a hearing, and the alleged abuse of discretion strictly inquired into. The case of the company or its directors is far weaker where the endeavor is to capitalize a large proportion of yearly earnings against the undoubted regulatory power of the state. I am of opinion that some such capitalization of income is proper; but can it be said in this case that a 10 per cent. reserve is so universally or even generally approved in manufacturing circles, so necessary for this corporation in the light of its past history, and so clearly shown to be all these things by the evidence herein, as to require the court to uphold the claim and accordingly seek to limit the regulatory power?

In my view the statement of this proposition is a sufficient answer to it, and I find that complainant has not sustained the burden of showing the general acceptance and reasonable necessity, and therefore the legality, of the reserve demanded. An allowance of 11 cents per 1,000 feet on the maximum production of complainant's own works to cover repairs, renewals, and depreciation, mediate and ultimate, is in my judgment sufficient. Making the deductions above discussed, I find com-

plainant's operating cost, for the manufacture and sale of its own product, to be $6,799,147.28.[1]

### Complainant's Income.

From the income as reported, $13,730,193.50, there must be deducted for reasons explained above:

| | | |
|---|---|---|
| Dividend on Coke & Coal Co.....................................$ | 5,000 | 00 |
| Rental of leased lands........................................ | 37,408 | 88 |
| Proceeds of sale of purchased gas (2,863,702,341 ft. at 99.967 cents average price)..................................... | 2,862,757 | 32 |
| Total .............................................$ | 2,905,166 | 20 |

—leaving as income from complainant's own product, $10,825,027.30.

This sum is more than could be obtained from selling the company's entire product at $1 per 1,000, the present price to private consumers, although for some years the city of New York has paid but 90 cents per unit. The excess arises from the fact that much of the gas sold the city is unmetered, and furnished under contracts requiring complainant not only to furnish the gas, but to maintain and repair the lamps, so that the amounts paid for street lighting largely exceed 90 cents per 1,000 for the gas consumed.

### Income from Purchased Gas.

The sale price was $2,862,757.32; cost, at 34.04 cents per 1,000 $997,-039.89; profit $1,865,717.43. Not all the gas either purchased or made during the period of inquiry was sold during the same period, but the unsold residue is too small to render the calculations erroneous for the purposes of this case, and much less than enough to constitute a proper reserve according to complainant's evidence.

This is the income sought by complainant to be capitalized or represented by the insertion in capital account of the Astoria plant; that is, because the Astoria factory would, when finished, furnish annually 4,000,000,000 feet of gas, and ultimately do so more cheaply than has yet been done, therefore the cost of the prospective works should be

---

[1] NOTE.—Summary of deductions:

| | | |
|---|---|---|
| Net cost of gas purchased from other companies................$ | 893,432 | 49 |
| From general expense account: | | |
| Interest on taxes............................................ | 94,506 | 29 |
| Taxes on lands not employed in gas business (estimate)........ | 29,071 | 00 |
| Legislative investigation expense............................. | 25,671 | 74 |
| Franchise tax litigation expense.............................. | 63,401 | 65 |
| Contingent fund, computed thus: | | |

| | | |
|---|---|---|
| Repairs and renewals of 1905 stated in station and distribution cost............................$ | 685,077 | 47 |
| "Ten-cent item" of report........................ | 1,328,316 | 37 |
| Total .......................................$ | 2,013,393 | 84 |
| "Eleven-cent fund" allowed in opinion........... | 1,172,359 | 10 |

| | | |
|---|---|---|
| Difference to be deducted.................................... | 841,034 | 74 |
| Total deductions........................................$ | 1,947,117 | 91 |

Which sum subtracted from $8,746,265.19, leaves $6,799,147.28, as the reasonable cost of manufacturing and distributing complainant's own product.

considered as an investment of complainant, employed in its gas business. The inadmissibility of this contention on legal grounds has been pointed out already. It remains to consider how the net income from purchased gas is to be treated, in ascertaining the probable entire income of complainant, derivable in the near future, from all its gas business.

The 3,000,000,000 feet purchased in 1905 were obtained from companies all but one of which are almost as completely dominated by complainant as is the Astoria Light, Heat & Power Company, and in that one it owns a majority of the stock. It has used that control or ownership to obtain gas at about holder cost plus 10 per cent.; such holder cost being slightly below the corresponding figures for complainant's own product. With the inequity or illegality of this arrangement, as against a minority, however small, of stockholders, we are not concerned, and possibly it has afforded to the selling companies a method of disposing of surplus product. The inquiry here is whether this business is to be regarded as permanent, and at what figure the purchase price of gas shall be fixed.

That the business is permanent, I think obvious. The consumption of gas on Manhattan Island has outstripped the capacity of the factories there situated, and I have already expressed my belief in the unlikelihood of any new factory being there built, and the bad judgment of attempting to do so. I cannot, however, think it equitable to charge against complainant all the profits derived during the period of inquiry from a method of business that in its present form cannot and ought not continue. The agreements under which complainant's controlled companies have furnished gas are now expiring. At what price should it be now obtainable from the factory, and by a purchaser which bears every cost of distribution?

It would, perhaps, be possible to hold complainant to present figures for mere lack of proof; the case having been presented to the master and court as if stock ownership produced a merger of the controlled and controlling companies. From a denial of that doctrine it might follow that existing profits, however obtained, should be the basis for measuring the future. This does not seem quite fair, and I think there is a basis of computation inferable from the evidence, though not directly testified to.

The 3,000,000,000 feet purchased in 1905 were not enough for complainant's wants. The Astoria plant was calculated for 4,000,000,000 feet, without any reference to a decrease in the price of gas. The increase in consumption during the years when prices were steady at a dollar per thousand was such as reasonably to justify this provision, entirely apart from the necessity for a reserve, which the demands of the consumer have lately made impossible. The ascertained cost of Astoria is $12,000,000, and if the expectation of lessened holder cost at that factory be only partially realized, 30 cents per unit is a high figure. If 4,000,000,000 feet be sold annually at 50 cents per unit, and disposed of at a dollar, the profit to the seller represents over 6 per cent. on the investment, and that to a purchaser who disposes of it by mingling his purchase with his own product is $2,000,000.

Here may be considered the natural imminent increase in con-

sumption, not due to prospective decrease in price, but to advancing population and industrial demands. It is prophesied by complainant's counsel that electricity is supplanting gas, so that as an illuminant gas is passing away; that the near future will produce light without heat; and that for heating and cooking purposes electricity will soon be a formidable rival, if not a victorious opponent. In some of this, there may be truth, yet nothing but time can furnish demonstration; and if the industrial development of the past be any guide, new inventions create new demands, and permit the old and new to flourish side by side. Such has been the history of steam and electricity, the telegraph and the telephone, and, thus far, of telegraphy with and without the wire. For changed circumstances, either of production or consumption, there must be new applications for relief. The business of the court is to deal with circumstances discoverable in the present, and by evidence. On the evidence I believe that complainant reasonably could and did expect when this bill was filed an annual income from purchased gas bought at a fair price as large as that admittedly shown for 1905.

It follows that income from the gas business for the purposes of this case should be thus computed:

Income from complainant's own product, gross.................$10,825,027 30
Expenses ................................................ 6,799,147 28

Net ...................................................$ 4,025,880 02
Net from purchased gas.................................... 1,865,717 43

Total net income......................................$ 5,891,597 45

On the volume of sales for 1905, the loss through reduction of price by 20 cents per 1,000 is, as reported, $2,656,600; net income under legislation here attacked $3,234,997.45.

It is true that in considering probable income from gas purchased I have assumed a consumption of the full product of the Astoria plant, or its equivalent, and therefore a total sale of about 1,000,000,000 feet a year over the business of 1905, and that the reduction in price must be considered as to that quantity. Such reduction would amount to approximately $200,000. I find that from the gas business humanly certain to be done by complainant, under the acts of Assembly in question, its net annual income would not be less than $3,030,000, upon a capital of tangible assets of $47,000,000. This finding allows nothing for increase of sales due to cheaper prices.

## The Rate of Return.

It thus appears that complainant, under the legislative reduction ordered, can earn over 6 per cent. upon the present value of its investment in tangible property. If such property only is to be considered, I think this return sufficient to satisfy the law, though the reported decisions do not furnish a plain legal measure of the rights of a party in complainant's situation.

The admitted doctrine (Covington, etc., Turnpike Co. v. Sanford, 164 U. S. 578, 17 Sup. Ct. 198, 41 L. Ed. 560) that a corporation subject to regulation has no right to earn any definite dividend upon its

share capital has no application here, on account of the diversity of reasons for issuing complainant's stock and the variety of its corporate interests. It is only by ascertaining what complainant has in its gas business that even an estimate can be made of how large a part of its share capital represents that business. Nor can I think that the legal rate of interest in the state of complainant's incorporation or operation affords any light on the subject, merely because it is established by law. As was observed by counsel, equally learned in law and politics, it would be easy to amend the legal rate, and judicial dependence upon an interest rate susceptible of change, by the same Legislature, that regulates the rate of earnings, would be, to say the least, inadvisable.

There is, however, evidential value in the established rate of usance for money, in so far as it expressses the settled conviction of the business community as to the worth of capital invested in enterprises not usually regarded as hazardous. Neither is the market price of the stock of a corporation in complainant's situation, nor the dividends paid thereon, ordinarily of value to the court. This company has for 20 years paid dividends averaging over 6 and under 7 per cent., while the price of its shares has at times so risen as to yield but 3 per cent. to the purchaser at highest rates, and in other years has been below par, although dividends were maintained as usual. These are the vagaries of speculation, or reflections of the necessities of borrowers on collateral, and not facts useful in an investigation such as this. Difficulties of this kind are encountered in every case of rate or earning regulation, and I believe the decisions end to-day about where they began—declaring only that "each case must depend upon its special facts" (Covington, etc., Turnpike Co. v. Sanford, supra) for discovering whether a rate "prescribed by a Legislature or a commission is unjust and unreasonable and such as to work a practical destruction to rights of property" (Reagan v. Farmers' L. & T. Co., 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014).

The question then becomes largely local, and decisions from one part of the country may be of small value in another, where conditions of business life are different. The true note was, I think, sounded in Milwaukee, etc., Co. v. Milwaukee (C. C.) 87 Fed., at page 586, where the local rate for approved and nonhazardous securities was taken as the final criterion. In respect of gas and electric companies, the conditions for the state of New York are well summarized in the prevailing opinion in Trustees of Saratoga Springs v. Saratoga Gas, etc., Co. (Sup. Ct. N. Y., App. Div., Third Dept., Nov. Term, 1907) 107 N. Y. Supp. 341; but they must be further localized in the case of a corporation monopolizing the gas service of the most crowded portion of the largest city in America. Such a business situation is secured against competition, because the monopoly is beneficial. To have the streets of the borough of Manhattan torn up to afford room (if room exists) for the mains of a rival is unthinkable. For the same reason, and because the population and its wants will increase, so far as human foresight can perceive, the amount of business will also increase. So that the

inquiry here is: What is a fair and reasonable rate of return upon the most favorably situated gas business in America, not forgetting that all gas businesses are inherently subject to many of the vicissitudes of manufacturing?

Much testimony has been introduced to show that certain investors in gas works well known throughout the country expect to obtain from 8 to 15 per cent. upon the price of what they can buy. Such testimony is not relevant. It must be admitted that investors are entitled to reap large rewards, if they can, from the hazards of a new business, or the rebuilding of a broken one. Such ventures are for exploitation, and the day for exploiting the business of selling illuminating and fuel gas in New York City is past—or certainly ought to be. The exploitation value in this case is represented by the enhancement over cost of land, mains, and services, arising from local conditions beneficial alike to this complainant and many other New Yorkers, who by judgment or luck purchased or constructed, perhaps generations ago, what many men desire. An interest in the gas business of this city is as nearly a conservative investment as any private manufacturing enterprise can furnish, and, although each case depends upon its special facts, there is, after problem conditions are ascertained, one question that can always be asked: What would that prudent man acquainted with business (so familiar to the readers of legal literature) do regarding such an investment, if it were offered to him? I think he would take it, not with enthusiasm, but as fairly safe local property, promising a rate of return sufficiently above the local mortgage market, to compensate for the additional and noninsurable hazard. He would expect, and have just and reasonable right to expect, a return of 6 per cent., not because that happens to be the interest rate by law established in the state of New York, but because it is the return ordinarily sought and obtained on investments of that degree of safety in the city of New York.

### Complainant's Intangible Property.

My conclusion that the legislation in question leaves complainant a return of over 6 per cent. upon the reproductive value of its tangible property in the gas business renders it necessary to consider the intangible assets of that business and their effect, if any, upon the ascertained return. The master's report finds it impossible to assign separate values to the two items of intangible assets claimed by complainant, viz., good will and franchises, but declares their combined values to be not less than $20,000,000. No more definite findings seemed needful, because the tangible assets found by the report were so large and the expenses of operation so great that the resultant income under the reduced gas rate was less than 4 per cent. upon tangible property alone. The testimony, however, is sufficiently full to enable the court to ascertain facts and render it unnecessary to remit the case.

### Good Will.

By the definition of this species of property adopted in Washburn v. National Wall Paper Co., 81 Fed., at page 20, 26 C. C. A., at

page 315, good will is "all that good disposition which customers entertain towards a house of business identified by the particular name or firm, and which may induce them to continue giving their custom to it." I cannot perceive how this complainant can possess a good will answering that description. There is nothing in the nature of its business enabling it to acquire good will in the property sense, or indeed in any other. It is required by law to furnish gas to all demanding it within a certain distance of the mains, and it owns the mains, service pipes, and meters. What induces a customer to remain with this company, its successor or vendee? Nothing that I can imagine, except a desire to avoid the nuisance of street digging in front of his house; a digging, however, entailing no expense upon him. Yet even this nuisance is in all human probability impossible of occurrence because of the beneficially monopolistic character of defendant's present occupancy of the streets of this city. Nor is there proof in the case of the value of what complainant calls good will, on which point I agree entirely with the master.

From the testimony I think it apparent that what is here meant by good will is the organization of complainant, long established, and doubtless well manned and equipped. Such organization is clearly of value, because without it neither its tangible nor intangible property can be profitably managed. Yet the organization itself is but a method of utilizing that which is invested. It is really dependent for its existence and continuance upon the franchise, without which there can be no useful organization. Tangible property has a certain value entirely apart from franchise, or right to continue business, or method of transacting business; but good will in the sense of organization for the business of furnishing gas can have no existence whatever apart or detached from the franchise conferring the necessary privilege. Would any one think of capitalizing good will of this kind and distributing its assumed value in the shape of new shares among shareholders, new or old? I think the most ingenious financier could not imagine such a proceeding, and, if this good will be not property capable of such capitalization and distribution, I do not think it property capable of capitalization as against the state.

Finally, this claim of good will seems to forget that for many years the price and distribution of complainant's gas has been regulated by law. A citizen is entitled to have a clean street before his house because he pays taxes, inter alia, for that purpose. He is much more plainly entitled to have complainant's gas in his house because the company must give it to him if he pays for it. I think it apparent that the conceivable good will of a gas company in this city is about equal to that of the street cleaning department of the municipal government.

### Franchises.

Under this branch of the discussion the most important and novel question is whether a public service corporation is entitled to add the value of its franchise to the assets from which a fair return may be lawfully demanded.

In this case complainant's proposition may, I think, be accurately stated thus: The right to place gas mains in the streets of New York and maintain them for private profit is in and of itself something upon or from which an income return may be justly and lawfully demanded, a return different and separable from that derived from all the company's tangible property or any part thereof. It is not asserted that any right such as above described was ever bought by complainant from either state or city, or that for such right any valuable consideration was ever paid in the usual legal sense of those words. Indeed, the asserted rights all date from that time in American economics when those promoting public works were regarded as public benefactors, and the right to serve the public was something thought to be sufficiently paid for by the act of service. In these later days, however, complainant, finding itself treated rather as a malefactor than a benefactor, brings this action to ascertain, inter alia, whether the latest statutory rate leaves it a fair return not only upon its tangible property, but upon the right to use that property in the gas business, which right is commonly called a franchise. As an original proposition I believe this claim unsound. Return can be expected only from investment, and he that invests must part with something in the act of investing. He that hath not sown shall not reap, and can it be said that complainant here, or any other corporation similarly situated, has invested its franchise in its business? It did not invest in its franchise because it did not pay for it; it did not invest its franchise because it did not part with it in the same way that it parted with money or money's worth in acquiring or creating mains or plants. The investment of property was made not in the franchise, but under the franchise, and on the faith thereof. The franchise is but a part of the power or privilege of sovereignty, allotted to a private person for the benefit of all and only incidentally given for private emolument.

If all franchises so allotted are private property for the purposes of rate regulation, as fully as land or money is private property, the nature of the doctrine is best seen by considering the case of a franchise just granted under which no capital has yet been invested, or one the use of which demands or permits no investment other than personal service or labor. Thus, if a private citizen be now granted the franchise here claimed by complainant, i. e., the right to establish and maintain gas mains in the streets of this city, what is the nature of the property right in such citizen before a main is laid or a foot of gas manufactured? What is its worth apart from performance under it and how can it be valued at its birth? Yet unless it can be seen to possess inherent value entirely apart from the earning capacity of the subsequent investment or from the actual earnings resulting from such investment, the value asserted or claimed is but a duplication of that derived from the use of the tangible property when so invested.

Again, let it be supposed that a citizen be granted a franchise to perform personal service only. The franchise of being a town crier or herald is a historical illustration. Such franchise is not different in kind from that here under consideration. Is there any value attach-

ed to that franchise beyond the right of working under its protection for a fair wage? And would the herald be justified in charging two prices for his proclamation; one for his service, and the other as return or income on his franchise?

The concepts of the nature and value of franchises are seen dimly and confusedly because of the failure to distinguish between productive and nonproductive property. Land, money, chattels, may by industry and intelligence be made productive without a franchise; but no excellence in these desirable qualities can ultimately render a franchise productive without the use of money, chattels, and land in conjunction therewith, and when the juncture is made the earning capacity of the real and personal property, plus the franchise, and plus intelligence and industry, is really no greater than it would be without the franchise, for the franchise has added no producing power to the realty or personalty; it has but authorized their employment in a particular way, and protected the owners while so employing them.

I can imagine no more than three ways in which the value of a franchise can be stated. It is valuable: (1) Because it authorizes the gainful use of private property in a particular manner; (2) because once obtained it is often difficult or impossible to get another like it; and (3) because it may be used to injure or hinder another enterprise, although itself conferring or securing nothing of value. The third method of statement has been accurately, though colloquially, described as "nuisance value," and is so obviously illegitimate as to require no discussion. The second method of statement, when carefully considered, asserts that because the sovereign has deemed it advisable to intrust a public work to one citizen or body of citizens such quasi monopolistic grant confers the right to charge for the service more than would be just or lawful were the occupation open to all. Nor does it change the truth of the last statement that the difficulty of procuring franchises produces, and long has produced, a traffic in them. On every private sale of franchise property the price paid is so much money lost to the public by official incompetence or worse, and such sale can confer on the vendee no right to compel the consumer to repay him a price which should have been paid to the state. For these reasons I believe that on principle a franchise should be held to have no value except that arising from its use as a shield to protect those investing their property upon the faith thereof, and that, considered alone and apart from the property which it renders fruitful, it possesses no more economic value for the investor than does an actual shield possess fighting value, apart from the soldier who bears it.

The very able counsel who have argued this cause unite in declaring that the exact question here presented makes this litigation a "pioneer case," and those for defendant have, for reasons as different as counsel were numerous, demanded that the matter be disposed of as one of first impression. It often occurs, however, that, upon the presentation of a question absolutely novel in its exact form, the decision of the trial court is guided, in the absence of directly controlling authority, by the trend of decisions, and methods of reasoning pursued in well-considered cases dealing with kindred topics, and even by the dicta of courts of approved authority, where such dicta indicate, as they often

do, a train of thought necessarily suggested by the exact matter in hand. It is this course I must pursue in respect of the broad question of valuing franchises for purposes of rate regulation. How novel it is, exactly as presented, is shown by the silence of most of the text-books concerning regulatory rates, and the summary and insufficient treatment accorded the question in the valuable treatise of Messrs. Beale and Wyman (section 362).

It is familiar doctrine that private citizens may acquire vested property rights through a series of even erroneous decisions; rights so firmly vested that it becomes unconstitutional for the court which persisted in error suddenly to rectify its mistakes to the detriment of those who had securely rested upon the decisions sought to be invalidated. A trial court is in somewhat such a case when confronted with a proposition concerning which as res nova it entertains no doubt, but finds it impossible to enforce the opinion entertained, without doing violence to theories of law and habits of legal thought fairly discoverable in preceding decisions of superior jurisdictions. In this case I am compelled to the conclusion that it is necessary to allow the discoverable value of complainant's franchises as part of that capital upon which a fair return must be allowed, because to refuse would disregard views expressed by higher courts regarding the general nature of franchises and regulation proceedings. Instead of attempting to minimize and distinguish the decisions to which I have been referred and many others, it is my duty to follow the method of reasoning there clearly indicated, leaving it to the higher tribunals to make distinctions which, if drawn by the lower court, would in my opinion savor of presumption.

It is not to be denied that such a franchise as that to place and maintain gas mains in city streets is, though secondary in its nature and inferior to the primary franchise of corporate existence conferred by the supreme authority, property "taxable, inheritable, alienable, subject to levy and sale under execution, to condemnation under the exercise of the right of eminent domain and invested * * * with the attributes of property generally." People v. O'Brien, 111 N. Y., at page 41, 18 N. E. 692, 2 L. R. A. 255, 7 Am. St. Rep. 684. And the same doctrine in language almost as forcible is laid down in Monongahela Navigation Co. v. United States, 148 U. S. 312, 13 Sup. Ct. 622, 37 L. Ed. 463, which case particularly and especially applied it to an instance of condemnation for a public use of the highest order.

If franchises are to be reckoned with and paid for in condemnation proceedings, must they also be reckoned with and allowed for in cases of rate regulation? The rights of condemnation and regulation are both confessedly exercises of police power. If regulation is to be regarded as pro tanto condemnation, then the same train of reasoning which requires compensation for franchises when all the property protected by the franchise is taken away requires that some compensation shall be left when the earning power only is reduced. This is the crucial point of inquiry, and the highest tribunal has not yet encountered the necessity of answering.

Yet it was said in Smyth v. Ames, 169 U. S. 544, 18 Sup. Ct. 433 (42 L. Ed. 819), that the "apparent value of the property and franchises

used by the corporation" was, inter alia, to be considered when determining the rates that might reasonably be charged; and in the same case it was asserted as a general proposition that a "corporation may not be required to use its property for the benefit of the public without receiving just compensation for the services rendered. Page 546 of 169 U. S., page 433 of 18 Sup. Ct. (42 L. Ed. 819). And there can be no doubt that in the schedule of "its property" the corporation may justly include its franchise. And in the same spirit are the remarks in Reagan v. Farmers' Loan & Trust Co., 154 U. S., at page 410, 14 Sup. Ct., at page 1058 (38 L. Ed. 1014), although the word "franchise" is not there used. In that case the proceedings of the Texas Railway Commission were under review, and how careful those commissioners were in valuing tangible property to the exclusion of franchises may be seen by the remarks of the Interstate Commerce Commission. 11 Interst. Com. R. 264. San Diego Water Co. v. San Diego, 118 Cal., at page 567, 50 Pac., at page 633 (38 L. R. A. 460, 62 Am. St. Rep. 261), was purely a case of rate regulation; and it is there declared that:

"The question of what is just compensation in such a case is, we think, in all respects analogous to the question which arises in every case of appropriation under the power of eminent domain, and it may be reduced to the formula that the public must pay the actual value of that which it appropriates to the public use."

And in the same spirit are the remarks of Morrow, J., in Spring Valley Water Works v. San Francisco (C. C.) 124 Fed., at page 594, which was also a case wholly of rate regulation. And this identity of spirit in the two proceedings has been explicitly recognized by this court upon an application for preliminary injunction in this case, reported in 146 Fed. 150. I think these cases reveal a line of reasoning which may be summed up thus: It is admitted that, if property protected by a franchise is condemned and wholly taken away from its owner, the franchise must be paid for. If its earning power be reduced by regulation, the value of the property is pro tanto reduced, and, since the franchise is property, the value of the franchise is also reduced. Therefore in some way the value of the franchise at the time of the proposed reduction must be ascertained, in order to discover how much it contributed to the earnings before reduction, and how much it suffers in common with other property by reason of the reduction. Indeed, it has been asserted that when the condemnation is absolute the owners may take the value assessed, reinvest it, and take their chances of gain elsewhere; while, if the condemnation be but partial and through rate regulation, such owners have no option but to continue to own the property and receive the reduced rates—with the result that, should no allowance be made for the franchise, owners are in a worse position when regulated than when their property is condemned outright. Ames v. Union Pacific Ry. Co. (C. C.) 64 Fed., at page 178. It is obviously true that if franchises have inherent value, and yet may be disregarded in regulating rates, it would be an easy matter to regulate profits as near the vanishing point as might be necessary, and then condemn property whose franchises had been so practically destroyed by regulation, at a price far below its worth, were

condemnation instituted without antecedent regulation; and this thought is prominent in 146 Fed., at pages 157, 158.

I conclude therefore that I am compelled to consider franchises not only as property, but as productive and inherently valuable property, and to add their value if ascertainable to complainant's capital account, before declaring the rate of return permitted complainant by the statutes complained of. See an endeavor to deliminate these two species of property in Kennebec Water District v. Waterville, 97 Me. 220, 54 Atl. 6, 60 L. R. A. 856.

### The Method of Valuing Franchises.

Upon this point, again, the diversity of view manifested by counsel on the same side reflects the difficulty of the problem; a difficulty accentuated in this state by the existence of the franchise tax law (chapter 712, p. 1589, Laws 1899). By that act the special franchises or privileges possessed by corporations such as complainant, together with certain kinds of property not taxed either as realty or personalty before its passage, e. g., mains and services, are subjected to taxation. The method of assessment followed in practice is to ascertain the value of all tangible property of a given corporation and the amount of its net earnings, allot to the tangible property a fair return out of earnings, and capitalize the residue thereof, if any, at the same fair rate, to ascertain the value of the special franchise. This is undoubtedly an easy and convenient method of assessing the tax, but as a scientific method of ascertaining the value of the franchise it is open to the obvious objection that, as long as the tangible property earns anything, and the franchise exists, the franchise contributes to the earning power, because it is only by virtue of the franchise that anything at all is earned.

Again, as a method of valuation applied not to taxation, but to rate regulation, the system is reducible to an absurdity, for at what point of time is the inquiry to be made? Clearly, before the reduced rate goes into effect. Yet by this method, since the fair rate of return upon tangible property is a constant figure, the capitalization of the residue at the same figure will always give a valuation for the franchise rendering reduction impossible.

As a result of this obvious absurdity, counsel have submitted the argument, equally ingenious and ingenuous, that, although the franchise tax law remains unrepealed, New York has by the regulatory statutes here in question abandoned the idea of taxing complainant's franchise, and substituted the scheme of regulating price of output. It should therefore be held: (1) That no future allowance be made for the payment of any franchise tax, because under this scheme of regulation value in the franchise disappears, and there can be no tax thereon; and (2) for the same reason franchises should be excluded from capital account, because by the regulatory statutes their value is altogether extinguished. As an illustration of the difficulty of the subject, the argument is admirable; but to ask the court to remove from the operating expenses of the company a tax lawfully laid in pursuance of existing statute, on the ground that a subsequent statute extinguished that upon which the tax operated, notwithstanding that

the only apparent effect of the 80-cent gas law was to increase the franchise tax, is a considerable demand upon credulity.

The master reports that the record contains little direct evidence as to the value of the franchises, and he might have added that if by direct evidence is meant testimony of the same kind regarding their value, as has been offered regarding every item of tangible property, there is none at all. I think it obvious, as I have endeavored heretofore to point out, that either for the purpose of condemnation or regulation the value of a franchise depends wholly upon what is earned under it, and I believe the best way of finding out how much a franchise separately considered is worth is to ascertain what those persons desirous of continuing operation under it consider it to be worth. In a corporation whose stock is freely bought and sold, such value is measured by the success attending the sale of stock based entirely upon capitalization of franchise; yet the value of stock issued only in consideration of the franchise is obviously dependent on earnings, after the stock based on tangible property has received a satisfactory dividend. This is really the same measure of value that the New York franchise tax commissioners are using, except that, instead of that reasonable return upon the tangible assets deemed by the commissioners sufficient, there is substituted the opinion of the investing or speculative public as to what constitutes a satisfactory rate of return upon all the stock. Thus, if the investment of $100,000 in a franchise protected business, authorized in the opinion of the promoters the issue of $200,000 worth of stock, and such stock for a number of years maintains itself at par, paying satisfactory dividends, it would be obviously fair to assert that in the opinion of the shareholders the franchise is worth $100,000, assuming no appreciation of tangible assets. Yet it will always be true that, unless the whole net return, compared with the value of tangibles, is above a satisfactory return on tangible investment alone, the addition of stock issued for franchise will be regarded as "water," and detract from the value of the entire issue, and I think this conclusive proof that value in a franchise depends wholly on what actual investment can earn.

I consider the real reason for that identification of regulation and condemnation proceedings which compels me to consider the value of franchises to be that for generations it has been the universal practice of American corporations, supported by the opinions of courts and counsel, to capitalize their franchises for all it was thought the traffic or business would bear, until the country is full of shareholders whose certificates of stock are based upon the belief that in some way or other such certificates were legally created pieces of property, and would, like other property, be protected by federal and state Constitutions.

These considerations, applied to the testimony herein, enable me to find that this complainant did at the beginning of its career measure the value of its franchises. It does not appear how it was done, nor why the figures selected were chosen; but it is true as matter of fact that, when complainant was organized in 1884 under a statute which in terms permitted it to acquire the property and franchises of the older gas companies consolidating to form it, it then issued stock of the par value of $7,781,000 representing the franchises it then acquired and

nothing else; and this stock is still outstanding, and has since 1884 been in the hands of purchasers, who I am compelled to think have a right to rely upon legal protection for legally issued stock.

There is no direct evidence that complainant's franchises in 1884 were worth $7,781,000, or are worth that much to-day. I do not see how such evidence can exist; but because complainant made an arbitrary valuation so long ago, issued stock on the faith thereof, did that lawfully, and has maintained dividends upon that stock ever since, I find it presumptio juris that complainant's franchises in 1884 were worth $7,781,000, and to that extent it is certainly entitled to protection against confiscatory regulation. No capital stock has since been issued upon the faith of franchises only. If, however, complainant's franchises were worth $7,781,000 in 1884, and its tangible property at the same time was appraised (as appears in evidence) at $30,000,000 (in round figures), then since complainant's business (in sales volume) has in 23 years almost quadrupled, and its tangible assets grown to $47,000,000, it appears to me that a fair method of fixing value of the franchises in 1905 is to assume the same growth in value for the franchise as is demonstrated by the evidence in the case of tangible property. If, therefore, the franchise valuation of 1884 was proportioned to personalty and realty of $30,000,000, a franchise valuation similarly proportioned to $47,000,000 in 1905 would be over $12,000,00. This I think a logical result from the assumption I am compelled to start with, i. e., that franchises have a separable and independent value. But there is, however, no method of valuing franchises except by a consideration of earnings. Earnings must be proportioned to assets, and both kinds of assets, tangible and intangible, must stand upon the same plane of valuation. Having therefore a measure of growth of tangible assets from 1884 to 1905, the franchise assets must be assumed to have grown in the same proportion. I find that the value of complainant's franchises at the date of inquiry was not less than $12,000,000, making a total valuation of $59,000,000, upon which the probable return is $3,030,000, or very considerably less than 6 per cent. This return is neither fair nor reasonable. It is, however, asserted that it is not confiscatory. That it does not confiscate all the income is admitted; but, in so far as there is any difference between the promised return and a fair return, there is a confiscation of that difference. Authorities need not be cited to show that the court can neither increase nor diminish the statutory price. It can only judicially decide whether the return is fair, and if it is not fully fair and wholly reasonable, there is a confiscation of something, it makes no difference how little. On this point there is nothing to be added to the remarks in Spring Valley Water Works v. San Francisco (C. C.) 124 Fed., at page 602.

## Existence of the Franchises.

It has been strongly urged in this cause that, even if franchises are property, and property to be taken into consideration in cases of rate regulation, this complainant does not own any franchise whatever. The arguments on this subject depend upon a careful examination of the rights conferred both by charter and contracts with the city, upon the companies which in 1884 united to form complainant. No fed-

eral question is involved in this contention. It is one on which it would be the duty of the federal courts to follow implicitly the rulings of the state courts, and I am therefore very loath to express any opinion on the matter. It is sought by complainant to avoid the discussion by stating that this is a collateral attack upon its franchises. I do not think so. If complainant is entitled to have its franchises considered, it is only because the franchise is an item of property, and therefore it must be shown to be at least in the possession of the complainant and actually enjoyed by it at the time of inquiry.

In the case of the land said to be a portion of the street occupied by one of complainant's factories, it was easy enough to prove possession, but whether one can be said to be in possession of a piece of intangible property, because he is apparently enjoying some of the earnings therefrom, is not so easy to assert. I do think, however, that the possession of the secondary franchise or right to lay and maintain mains in the major portion of the city of New York can and should be inferred in complainant from the undisputed fact that it long has been and still is being taxed upon those very rights. Of course, it is not proof of ownership, any more than paying taxes upon real estate is proof of title to land; but where the tax is laid in personam, and not in rem, and by the same authority which now questions the existence of the franchise, it is, .I think, conclusive proof of complainant's actual enjoyment of the rights secured by the alleged franchises.

Under the decisions of the highest court of this state, however, I incline to the opinion that complainant is not only in possession, but in legal enjoyment of, rights enabling it to lay and maintain mains on Manhattan Island. I believe People v. O'Brien, supra, has definitely established the proposition that a franchise survives the legal death of the corporation to which it is granted, and that Matter of Long Acre Electric L. & P. Co., 188 N. Y. 361, 80 N. E. 1101, necessarily holds that a secondary franchise may be assigned, and the title thereto may pass from one corporation to another through an individual. Under these cases, complainant is in the possession, enjoyment, and ownership of the franchises originally granted to the Harlem Gaslight Company, the Knickerbocker Company, and the Anthracite Gas Lighting & Heating Company, and these franchises are sufficient to cover all that complainant does, and permit all it requires for Manhattan Island. Without expressing any opinion as to the other alleged franchises, I consider this finding sufficient to support the value heretofore stated.

It has not been overlooked that according to one of complainant's witnesses $7,781,000 "was considered to represent in 1884 the franchises and business and contracts and patents and good will—everything in fact except the tangible property." I consider this undoubtedly true statement immaterial, except as tending to show the difficulty of appraising franchises at all, and the laxity with which all items of intangible property are usually regarded in corporation management. The overruling consideration is that in 1884 there were issued shares of stock of the par value of $7,781,000, that that stock is outstanding yet, and that it represents a certain fractional part of a business which has enormously increased. Inasmuch as everything

in that business is accounted for except the franchises, I have taken that figure as indicating the nearest approach to franchise value, given by the evidence, and a proper starting point for computation.

## The Question of Pressure.

On this point I think the testimony amply supports the master's finding, which is, in substance, that the pressure required by law is not physically impossible if the entire system of gas distribution in this city be reconstructed. It is a scientific fact incapable of change even by legislation that pressure in a gas pipe varies with altitude. By the expenditure of about $4,000,000 for construction of mains and valves alone, exclusive of any pumping stations or other apparatus, it might be possible to establish and maintain the pressure called for by these acts. Such a thing is commercially impossible, and, even if it were done (of course, at complainant's expense), it remains commercially impossible, since the other parts of the statutes cut off the surplus income out of which alone complainant could be expected to perform the work. A change by means of new capital would be impossible, because when made it would not add a dollar to income.

## Penalty Clauses.

The master enters upon a computation of the effect of these penalty clauses in the case of a corporation having about 390,000 customers, and concludes that "said penalties, so far as the evidence shows, are unexampled in extent and severity." This is but confirmation of the finding based on affidavits made when the preliminary injunction herein was granted. I think there is nothing to add to the statements of facts and law set forth in 146 Fed. 154. I am of the opinion that the penalty clauses in both statutes are clearly obnoxious to the remarks of Brewer, J., in Cotting v. Kansas City Stock Yards Co., 183 U. S. 79, 22 Sup. Ct. 30, 46 L. Ed. 92.

## The Remaining Contentions of Complainant.

It does not seem necessary to express any opinion as to whether the statutes under consideration taken together are unconstitutionally discriminatory. The findings already made dispose of the case. This is also true of the contention that the statute creating the Gas Commission unlawfully delegated to that body legislative power. It is enough for the purposes of this case that the order of that commission laid down and sought to enforce a confiscatory rate for the sale of gas, and the larger question raised in argument is now about to go before the highest court of this state in Trustees of Saratoga Springs v. Saratoga Gas, etc., Co., supra. The pendency and approaching final disposition of that litigation is an additional reason for withholding comment here.

## The Jurisdiction of the Court.

Defendants' objections under this head may be divided into three: First. That the question propounded cannot be reviewed because the reduced rate was established (apart from the action of the Gas Commission) by direct legislative act; second, that the action as against

the Attorney General of this state is in violation of the eleventh amendment; and third, that the action is not well brought in equity.

The proposition (to quote from a brief) that "the reasonableness of a rate regulation is a judicial question only when prescribed by a subordinate body" is, to say the least, somewhat astonishing. As argued, the doctrine is that, while a Legislature cannot absolutely confiscate, it can under the guise of regulation go just short of that point, provided only that such result be reached, not by the action of a commission or subordinate, but by direct legislative fiat. When this is the law, representative government, as prescribed by Constitutions, both federal and state, is at an end, and, so far as the judicial department of the government is concerned, it is sufficient to cite the ruling that it is "both the power and the duty (of the courts) to inquire whether a body of rates prescribed by a Legislature or a commission is unjust or unreasonable and such as to work a practical destruction to property, and if found so to be to restrain its operation." Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014.

As to the argument that this action as against the Attorney General is in violation of the eleventh amendment, I think it sufficient to observe that it is not sought herein to restrict or enjoin the operation of the criminal law of the state of New York, nor to obtain an injunction against the law officers of state or county preventing them from doing not only what they have not done, but what they are not bound to do. The penalty clauses in the act under consideration must be enforced by civil actions and by the defendants, pursuant to section 1962 of the Code of Civil Procedure. Whatever may be the law, if a Legislature first prescribes an obligatory contract for a public service corporation, then makes a violation of that contract a crime, and intrusts the indictment for the punishment thereof to its Attorney General, the questions suggested by such modern procedure are not here involved, and I think the doctrine of Smyth v. Ames, supra, that "a suit against individuals for the purpose of preventing them as officers of a state from enforcing an unconstitutional enactment to the injury of the rights of the complainant is not a suit against the state," still obtains, and has been frequently affirmed, as in Prout v. Starr, 188 U. S. 537, 23 Sup. Ct. 398, 47 L. Ed. 584, and Mississippi Railroad Commission v. Illinois Central Railroad, 203 U. S. 335, 27 Sup. Ct. 90, 51 L. Ed. 209. The title of Attorney General makes no difference. There are occasions when he represents and embodies the majesty of the state, and is therefore as secure from suit as is the state itself. But when he is unconstitutionally directed, even by the state, to injure a private citizen or corporation in a proceeding in which the state has no pecuniary interest at all, I am referred to no authority to show that the title he bears permits him to violate the supreme law of the land.

As to the equitable remedy sought being improper, I cannot think it necessary to review the decisions, most of which have been cited already in this opinion. If there was ever an action brought to which the remarks of Harlan, J. (169 U. S., at page 517, 18 Sup. Ct., at page 418 [42 L. Ed. 819]) regarding multiplicity of suits are applica-

ble, this is that case, and a much more difficult and successful application of the remedy by injunction in anticipation of injury by public officials is furnished by Raymond v. Chicago Union Traction Co. (Oct. 21, 1907) 28 Sup. Ct. 7, 52 L. Ed. ——.

It results that the first prayer of the bill must be granted, upon the ground that both of the statutes involved, as well as the order of the Commission of Gas and Electricity, are in contravention of the fourteenth amendment of the federal Constitution; and that the relief asked in the second and third prayers of the bill must also be granted.